UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
_ TAMPA _

Civil Action No.

8:07-CV-00690-T-17MSS

| | |
|---|---|
| BANKERS LIFE INSURANCE COMPANY, | : |
| | : |
| Plaintiff, | : |
| | : |
| vs. | : |
| | : |
| CREDIT SUISSE FIRST BOSTON | : |
| CORPORATION, also known as Credit Suisse | : |
| Securities (USA) LLC, CREDIT SUISSE | : |
| FIRST BOSTON MORTGAGE SECURITIES | : |
| CORP., DLJ MORTGAGE CAPITAL, INC., | : |
| TRIAD GUARANTY INSURANCE | : |
| CORPORATION, SELECT PORTFOLIO | : |
| SERVICING, INC. and BANK OF NEW | : |
| YORK, | : |
| | : |
| Defendants. | : |

## COMPLAINT

Plaintiff, BANKERS LIFE INSURANCE COMPANY ("BANKERS"), by its undersigned attorneys, hereby sues Defendants CREDIT SUISSE FIRST BOSTON CORPORATION, a/k/a CREDIT SUISSE SECURITIES (USA) LLC ("CSFB"), CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP. ("CSFB Mortgage"), DLJ MORTGAGE CAPITAL, INC. ("DLJ"), TRIAD GUARANTY INSURANCE CORPORATION ("TGIC"), SELECT PORTFOLIO SERVICING, INC. ("SPS") and BANK OF NEW YORK ("BoNY") and alleges as follows:

### JURISDICTION AND VENUE ALLEGATIONS

1.     This is an action for damages and other relief in excess of Seventy-Five Thousand ($75,000.00) Dollars and is within the monetary jurisdiction of this Court.

{216030.0001/N0651670_1}

2.     Certain claims asserted herein arise under and pursuant to §10(b) of the Securities and Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, and Section 12 of the Securities Act of 1933, 15 U.S.C. § 77L.

3.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337 and Section 27 of the 1934 Act.     In addition, this Court has jurisdiction pursuant to 28 U.S.C. § 1332, as there is complete diversity among the parties and the amount in controversy exceeds $75,000.00.

4.     Venue is proper in this District pursuant to § 27 of the 1934 Act and 28 U.S.C. § 1391(b) (action not founded solely on diversity).  Upon information and belief, substantial and material events and omissions giving rise to this action, including certain transactions, acts, practices and course of business, took place in the Middle District of Florida.

5.     In connection with the acts alleged herein, the Defendants, directly or indirectly, used means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

6.     BANKERS is a corporation organized and existing under and by virtue of the laws of the State of Florida, with its principal place of business at 360 Central Avenue, St. Petersburg, FL 33701.

7.     CSFB is a Delaware corporation, with its principal place of business in New York, New York.  CSFB is, and was at all relevant times, a securities broker/dealer licensed to do business in the State of Florida and registered with the United States Securities and Exchange Commission ("SEC"), the State of Florida and the National Association of Securities Dealers, Inc. ("NASD").  CSFB is subject to the laws of the United States and the State of Florida, and

the rules and regulations promulgated thereunder by the SEC and subject to the rules and regulations of the self-regulating organizations ("SROs") of which it is a member, in addition to being subject to its own internal rules and regulations.   CSFB was the underwriter of the securities ("Securities") which are the subject of this Complaint.

8.   CSFB Mortgage is a Delaware corporation, with its principal place of business in New York, New York. CSFB Mortgage is an affiliate of CSFB. CSFB Mortgage acquired from DLJ the mortgage loans which served as collateral for the Securities described herein and assigned the mortgage loans to a trust for the benefit of the holders of the Securities.

9.   DLJ is a Delaware corporation, with its principal place of business in New York, New York. DLJ is an affiliate of CSFB and the seller of the mortgage loans which served as collateral for the Securities.

10.   TGIC is an Illinois corporation, with its principal place of business in Greensboro, North Carolina.  TGIC issued a mortgage guaranty insurance policy purportedly to cover the mortgage loans which served as collateral for the Securities.

11.   SPS is a Utah corporation, with its principal place of business at 3815 Southwest Temple, Salt Lake City, Utah.  SPS is a controlled affiliate of CSFB and is the servicer of the mortgage loans which serve as collateral for the securities.

12.   BoNY is a commercial bank chartered under the laws of the State of New York with its principal place of business in New York, New York.  In connection with the transactions alleged herein, BoNY has served as Trustee for the benefit of the holders of the Securities.

13.   This Court may properly exercise personal jurisdiction over each Defendant pursuant to the claims asserted herein and Florida's Long Arm Statute § 48.193(1) and § 48.193(2), Florida Statutes, since at all times material hereto, Defendants engaged in business

{216030.0001/N0651670_1}

3

activities in Florida, committed tortious acts in Florida, breached contracts in Florida, caused injury to persons in Florida arising out of an act or omission by Defendants outside and within Florida, and otherwise engaged in systematic and continuous contact with Florida.

## FACTUAL BACKGROUND

14.     BANKERS purchased asset-backed securities ("ABS Securities")[1] issued by CSFB for its investment portfolio in the secondary market.[2] The ABS Securities purchased by BANKERS were Security I-B-2 and Security I-B-3 (the "Certificate," "Security" or "Securities"), which were classes (tranches) in the ABS Securities issue of mortgage-backed pass-through certificates entitled "CSFB Mortgage-Backed Pass-Through Certificates, Series 2001-28" ("CSFB 2001-28") (the "Transaction").

15.     CSFB, as underwriter and issuer, sold to investors and other broker-dealers, the Securities which were issued and offered pursuant to CSFB 2001-28. Eleven classes of instruments, including Securities I-B-2 and I-B-3 of the CSFB 2001-28 Certificates were sold, with a total principal balance of $302,634,786, and a closing date of November 30, 2001.

16.     Security I-B-2 was acquired by BANKERS in two separate purchases as follows:

a)     $800,000 original face amount of January 12, 2004 at a price of 104 24/32. ($811,685.87). The current face of I-B-2 at the time of purchase was $773,860.49.

b)     $95,000 original face amount on February 25, 2004 at a price of 104 8/32. ($95,801.51). The current face of I-B-2 at the time of purchase was $91,895.98.

---

[1] On January 18, 2005, the SEC approved the following definition of Asset-Backed Securities:

> The term "asset-backed security" is currently defined in Form S-3 to mean a security that is primarily serviced by the cash flows of a discrete pool of receivables or other financial assets either fixed or revolving that by their terms convert into cash within a finite time period plus any rights or other assets designed to assure the securing or timely distribution of proceeds to the security holders.

[2] The secondary market is where mortgage loans that have been packaged and/or securitized trade.

17.     Security I-B-3 was acquired by BANKERS in a single purchase in accordance with the following terms:

> $500,000 original face amount on February 2, 2004 at a price of $100.00 (par).  The current face of Security I-B-3 at the time of purchase was $483,662.81.

18.     The Transaction was structured as a standard ABS Securities underwriting, as described in "Fixed-Income Sectors:  Asset-Backed Securities," Dwight Asset Management Company 2005 as follows:

> The financial institutions that originate the loans sell a pool of cashflow-producing assets to a specially created third party that is called a special-purpose vehicle (SPV).  The SPV is designed to insulate investors from the credit risk of the originating financial institution.  The SPV then sells the loans to a trust which issues interest bearing securities that can achieve a credit rating separate from the financial institution that originates the loan.  The typically higher credit rating is given because the securities that are used to fund the securitization rely solely on the cash flow created by the assets, not on the payment promise of the issuer.

19.     The collateral for CSFB 2001-28 consisted of a mortgage pool of one group of 3,055 fixed rate mortgage loans ("Group I mortgage loans") with an aggregate principal balance of $247,399,776 and a second group of 393 adjustable rate mortgage loans ("Group II mortgage loans") with an aggregate principal balance of $57,521,925.  The aggregate principal balance of the two groups was $304,921,701.

20.     As part of the creation and packaging of the Securities, CSFB Mortgage acquired approximately 97% of the Group I and Group II mortgage loans from DLJ, as noted above. The small amount of remaining mortgage loans were also acquired by DLJ from Washington Mutual Mortgage Securities Corp. ("WMMSC").  CSFB performed no due diligence on the mortgage loans collateralizing the Securities purchased by BANKERS.  CSFB selected the servicer, the issuer of the insurance coverage and the mortgage loan originator in the Transaction.  CSFB

controlled the activities of each participant and used this control to the detriment of BANKERS and other holders of the Securities.

21.     CSFB Mortgage established a trust pursuant to a pooling and servicing agreement ("PSA") among CSFB Mortgage, DLJ and WMMSC as sellers of the mortgage loans; Vesta Servicing, LP ("Vesta"), predecessor of SPS and also a controlled affiliate of CSFB, as servicer of 96.55% of the Group I mortgage loans and all of the Group II mortgage loans; WMMSC, as servicer of 3.45% of the Group I mortgage loans; Bank One, National Association ("Bank One"), as trustee, predecessor of BoNY, and Vesta as special servicer for the Group I and Group II loans.

22.     In connection with the creation of Security I-B-2 and Security I-B-3, Defendants obtained a rating of the Securities from Moody's Rating Service ("Moody's").

23.     Prior to the dates of purchase by BANKERS of Security I-B-2, it was rated A2 by Moody's with a maturity date of November 25, 2031 and a projected weighted average life[3] of nine (9) years. Moody's long-term obligation ratings are opinions of the relative credit risk of fixed-income obligations with an original maturity of one year or more. The Moody's ratings address the possibility that a financial obligation will not be honored as promised and reflect both the likelihood of default and the probability of a financial loss in the event of default. Moody's rating of A2, considered upper medium grade, for Security I-B-2 is a designation of investment grade, meaning the security is considered eligible for bank investment and is subject to low credit risk.

---

[3] Weighted average life is defined by the Bond Market Association as "the time-weighted average maturity of a stream of principal cash flows. . . . It is the usual time dimension cited in the selling and trading of amortizing ABS." Average life can readily be estimated for a security that pays principal in a single payment. For an amortizing structure, the average life varies, depending on the prepayment assumptions. Based on the structure of a particular ABS and the type of underlying collateral used, ABS "tranches" — separate classes of securities — may be created with lives that correspond to the maturity and duration requirements of a broad range of investors — from short-term money market tranches to long-term assets.

24.     Similarly, prior to the date of purchase by BANKERS, Security I-B-3 was Moody's rated Baa2, an investment grade designation, with a maturity date of November 25, 2031. Due, in fact, to the lower rating at the time of purchase, BANKERS paid a lower price for Security I-B-3 than was paid for Security I-B-2.

25.     BANKERS relied on CSFB's assurances and representations regarding the Moody's rating assigned to the Securities.

26.     As more fully set forth below, CSFB withheld material information on the true status of these Securities, which, if properly disclosed, would have resulted in a substantial downgrade of the Moody's rating.

27.     For example, following the purchase of the Securities by BANKERS, both Security I-B-2 and Security I-B-3 suffered a series of Moody's rating downgrades.

28.     Security I-B-2 suffered a series of Moody's rating downgrades as follows:

| Rating | Date of Downgrade |
|--------|-------------------|
| A2*- | 1/05 |
| Baa3 | 3/05 |
| Baa3*- | 7/05 |
| B1 | 9/05 |
| B1*- | 7/06 |
| Caa1 | 10/06 |

29.     Set out below is an explanation of the Moody's rating in each downgrade of Security I-B-2;

**A2*-:**     The "*-" means the security is on negative credit watch for its A2 rating.

**Baa3:**     The security remains investment grade but the obligations are subject to moderate credit risk. The obligations are considered medium-grade, and as such, may possess certain speculative characteristics.

**Baa3*-:**     The security is on negative credit watch for its Baa3 rating.

**B1:** The security is now speculative grade.  The obligations are considered speculative and are subject to high credit risk.

**B1\*-:** The security is on negative credit watch for its B1 rating.

**Caa1:** The security is lower speculative grade.  The obligations are judged to be of poor standing and are subject to very high risk.

30.    The latest Moody's rating downgrade to Caa1 has reduced the market value of Security I-B-2 to a nominal sum.  The current market price of Security I-B-2 is estimated to be approximately $8.00 compared to BANKERS' purchase price of $104.75 on one piece and $104.25 on the other.  The status of both pieces of I-B-2 and the current loss is set out below:

**PIECE 1**

| | |
|---|---|
| Current face @ purchase | $  773,860 |
| Purchase price @ $104.75 | $  811,685 |
| Current face on 3/25/07 | $  636,127 |
| Current market value on 3/25/07 @ $8.00 | $    55,036 |
| Estimated Loss | $  585,237 |
| Principal and interest loss as of 3/25/07 | $  122,506 |
| | |
| Approximate Loss | $  707,743 |

**PIECE 2**

| | |
|---|---|
| Current face @ purchase | $    91,895 |
| Purchase price @ $104.25 | $    95,801 |
| Current face on 3/25/07 | $    75,540 |
| Current market value on 3/25/07 @ $8.00 | $      6,043 |
| Estimated Loss | $    69,497 |
| Principal and interest loss as of 3/25/07 | $    14,547 |
| | |
| Approximate Loss | $    84,044[4] |

31.    Similar to Security I-B-2, between January, 2005 and September, 2005, Security I-B-3 has suffered a series of rating downgrades by Moody's as follows:

---

[4]   An additional loss is reflected in the fact that both pieces were purchased at a premium (over par value) and payoff at par.  The additional "premium loss" is approximately $34,000 making a total loss of approximately $825,787 for both pieces.

| Rating | Date of Downgrade |
|--------|------------------|
| Baa2*- | 1/05 |
| B1 | 3/05 |
| B1*- | 7/05 |
| Ca | 9/05 |

32.     Set out below is an explanation of Moody's rating in each downgrade of Security I-B-3:

**Baa2*-:**   The security is on negative credit watch for its Baa2 rating.

**B1:**   The security is now speculative grade.  The obligations are considered speculative and are subject to high credit risk.

**B1*-:**   The security is on negative credit watch for the B1 rating.

**Ca:**   The security is next to the lowest speculative grade.  The obligations are highly speculative and are likely in, or very near, default with some prospect of recovery of principal and interest.

33.     The September, 2005 Moody's rating downgrade reduced the market value of Security I-B-3 to zero compared to the purchase price of $483,662.81.  As of March 25, 2007, the principal balance of I-B-3 was zero and BANKERS has realized a principal loss of $462,553.00 and an interest loss of $32,540.00 for a total loss of $495,093.00.

34.     The foregoing Moody's downgrades of Securities I-B-2 and I-B-3 could have been substantially lessened or avoided had the representations made by Defendants been true and had Defendants fulfilled the fiduciary obligations owed to BANKERS.

35.     Had the Securities been properly downgraded prior to purchase, BANKERS would not have purchased the Securities.

36.     In addition to misrepresenting the Moody's rating, Defendants contrived a scheme to create a false investment product worth substantially less than the represented value of the Securities sold by Defendants.

{216030.0001/N0651670_1}

9

37.     Defendants created the Securities in an effort to induce purchasers to purchase the

Securities under the guise that they were "safe", minimum risk, fixed-income products.

Defendants implemented the foregoing scheme by making the following misrepresentations to

BANKERS and the market:

a.      That the maximum amount of insurance coverage available to investors, including Bankers, was equal to 7.00% of the aggregate principal of $302,634,786 (approximately $21.1 million dollars) and that the Securities were guaranteed to be protected with $21.1 Million in mortgage pool insurance under the policy provided by TGIC.

b.      That TGIC issued, for the benefit of BANKERS, a loan level mortgage guaranty insurance policy ("TGIC policy") covering substantially all of the mortgage loans with loan-to-value ratios ("LTV") in excess of fifty (50%) percent at origination, and that the premium for the TGIC policy was calculated as a per annum percentage of 86 basis points (.86%) applied to the outstanding principal balance of each mortgage loan at the end of the prior calendar month.

c.      That the TGIC policy included coverage against a loss sustained by reason of a default.

d.      That there would be private mortgage insurance (PMI)[5] coverage to provide protection on each loan with an LTV ratio in excess of 80%.

e.      That credit support would be provided by over-collateralization[6] ("O/C") of $2,286,915 which would be properly administered.

f.      That fraudulent mortgage loans would be tendered to DLJ.

g.      That the mortgage loans would be properly serviced.

h.      That insurance claims would be properly filed and pursued.

---

[5] PMI policies were issued by private mortgage insurance companies to cover 19.79% of the mortgage loans which had higher LTV's. PMI is generally required by the originator of a mortgage loan when the LTV of the loan is higher than 80.01%. PMI covers the principal amount of the mortgage loan which is in excess of 80% of the appraised value. PMI provides no protection to the owner of the mortgage in event of a default caused by fraud and misrepresentation in the origination of the mortgage loan.

[6] The original O/C of $2,286,915 was the difference between the total unpaid principal balance of $304,921,701 of the mortgage loans for the Transaction minus the principal amount sold to investors ($302,634,786). CSFB, SPS and others conspired to charge loan losses to the O/C account which should have been put back to DLJ, the loan originator, or a claim for insurance should have been filed with TGIC. The current balance of the O/C is zero because CSFB, SPS and others have wrongfully charged the O/C for losses that should have been covered by TGIC insurance or tendered to DLJ in violation of the representations made to BANKERS.

38.     Defendants further represented to BANKERS, and others, that the mortgage loans were purchased from "highly credible financial institutions which were supervised and examined by a federal or state authority."

39.     The foregoing was a material representation to BANKERS, as well as to other purchasers in the secondary market, when, in fact, Defendants had full knowledge that many, if not most, of the mortgage loans, purchased from these highly regarded originators, were not direct mortgage loans made to borrowers who were customers of the financial institutions, but were mortgage loans of lesser quality purchased from third party wholesale originators. The "highly credible financial institutions" had no problem in aggressively purchasing these mortgage loans from wholesale originators as the mortgage loans would be immediately assigned to CSFB, which was done with the full knowledge and encouragement of CSFB.

40.     Upon information and belief, CSFB's motive was to gather collateral, increase the size of the deal, and increase profitability without regard for the interests of BANKERS. The true source and nature of the mortgage loans was never shared with BANKERS.

41.     Specifically, CSFB knew, or in the exercise of a minimal degree of care, should have known that many of the mortgage loans used as collateral for the Securities were:

         (a)     originated with inadequate underwriting criteria;

         (b)     originated in such a way as to result in excessive risk to BANKERS;

         (c)     originated with a large volume of poor quality loans;

         (d)     originated by wholesale originators who were openly and actively engaging in improper lending practices;

(e)     originated as adjustable rate mortgages to subprime borrowers by qualifying the borrowers with low initial payments without an appropriate analysis of the borrowers' ability to make payments at the fully indexed rate;

(f)     originated as to borrowers without considering appropriate documentation and/or verification of their income;

(g)     originated containing features requiring frequent refinancing;

(h)     originated to borrowers with inadequate debt-to-income ratios; and

(i)     originated without properly considering borrowers' ability to meet their overall level of indebtedness.

42.     All of the foregoing representations, coupled with Defendants' reputation and marketing efforts regarding the nature and minimal risk of the Securities, induced BANKERS to purchase Security I-B-2 and Security I-B-3 as set forth above.

43.     BANKERS subsequently discovered that Defendants' representations were false and misleading, and that Defendants omitted numerous material facts to BANKERS.

44.     Indeed, it was discovered that CSFB controlled the source of almost all of the mortgage loans that constituted the pool, and as a result:

(a)     No due diligence was performed on the mortgage loans;

(b)     CSFB knew that shoddy, inferior mortgage loans were aggressively purchased from wholesale originators;

(c)     Representations and warranties were made by DLJ which CSFB knew would not be honored; and

(d)     CSFB knowingly accepted and included in the Transaction as collateral, mortgage loans originated by DLJ, violating the foregoing representations and warranties, and at

the same time, CSFB attempted to avoid responsibility by "disclosing" that no due diligence had been performed. The foregoing was merely a "partial" disclosure and omitted relevant and essential facts as described above.

45.     In addition, CSFB and SPS administered the mortgage loans, which constituted the collateral for the Securities, and made improper advances of principal and interest to maintain the illusion that numerous mortgage loans constituting collateral were "good" performing loans and to conceal the material deficiency of the mortgage loans.

46.     CSFB and SPS had an obligation to pursue foreclosure and other available remedies which would have resulted in substantial protection being afforded to BANKERS, but did not do so in a timely manner.

47.     CSFB and SPS also had an obligation to pursue claims on behalf of BANKERS for the promised TGIC insurance coverage, but did not do so.

48.     Furthermore, CSFB and SPS had an obligation and were responsible for the following:

> (a)     Collection of principal and interest payments from the mortgagor;
>
> (b)     Collection of tax and insurance escrow payments from the mortgagor;
>
> (c)     Payment of principal and interest payments; and
>
> (d)     Payment of taxes and insurance premiums when due.

49.     CSFB and SPS did not fulfill the foregoing obligations.

50.     CSFB and SPS have also failed and refused to fulfill their obligations for managing delinquent loans, bankruptcies and foreclosures as well as filing claims under applicable mortgage guaranty insurance policies and hazard insurance policies, and to provide loan level information to the Trustee regarding insurance claims and insurance proceeds.

{216030.0001/N0651670_1}

13

51.     SPS receives a substantial servicing fee for providing these services. Under the

PSA for CSFB 2001-28, the weighted average servicing fee payable to SPS is approximately 49

basis points for the fixed rate loans and approximately 50 basis point the adjustable rate loans,

per annum, of the outstanding principal balances of all mortgage loans.

52.     Under the PSA for CSFB 2001-28, SPS is required to provide to the trustee loan

level information regarding insurance claims and insurance proceeds.    This was not done.

Section 2.07(m) provides in relevant part:

> Each servicer shall provide, promptly upon request therefore, any such additional
> loans-level information or data that the Trustee may from time to time reasonably
> request in order to enable the Trustee to perform its duties as set forth herein.

Failure by SPS to provide the loan level insurance information is a material breach of the PSA.

53.     Section 3.13 of the PSA entitled "Documents, Records and Funds in Possession of

a Servicer to be Held for the Trustee" provides in relevant part:

> Notwithstanding any other provision of this Agreement, each Servicer shall
> transmit to the Trustee as required by this Agreement all documents and
> instruments in respect of a Mortgage Loan coming into the possession of the
> related Servicer from time to time required to be delivered to the Trustee pursuant
> to the terms hereof and shall account fully to the Trustee for any funds received
> by such Servicer or which otherwise are collected by such Servicer as Liquidation
> Proceeds or Insurance Proceeds in respect of any Mortgage Loan.

54.     Upon information and belief, SPS failed and refused to pursue said appropriate

remedies in a clear effort to disguise the fact that many of the subject loans were flawed and

defective.

55.     Moreover, pursuant to the Transaction and consistent with the representations

made to BANKERS, in the event of any breach of any warranty relating to a mortgage loan that

materially and adversely affected BANKERS' interests in that mortgage loan, DLJ, as seller of

that mortgage loan, was obligated to do one of the following:

(a)     cure that breach;

(b)    repurchase that mortgage loan at an amount equal to the sum of the unpaid principal balance of the mortgage loan on the date of repurchase, and accrued interest on that mortgage loan at the applicable mortgage rate from the date through which interest was last paid by the mortgagor to the date of repurchase; or

(c)    substitute a replacement mortgage loan for that mortgage loan (within two years of the closing date of November 30, 2001).

56.    However, the "cure," "repurchase" or "substitute" requirements and obligations as Defendants- materially represented, motivated and instigated the Defendants to act only in their best interests and contrary to the best interests of BANKERS, inasmuch as it was economically advantageous for Defendants to ignore their obligations and commitments to BANKERS rather than honor the representations and warranties made by CSFB and DLJ in the PSA to BANKERS:

a.    (xi)    No fraud, error, omission, misrepresentation, negligence or similar occurrence with respect to a Mortgage Loan has taken place on the part of Seller or the Mortgagor, or, to the best of the Seller's knowledge, on the part of any other party involved in the origination of the Mortgage Loan.

b.    (xxi)    the Mortgage File contains an appraisal of the related Mortgaged Property signed prior to the final approval of the mortgage loan application by a Qualified Appraiser, who had no interest, direct or indirect, in the Mortgaged Property or in any loan made on the security thereof, and whose compensation is not affected by the approval or disapproval of the Mortgage Loan.

c.    (xxxvii)The Mortgage Loan was originated by a mortgagee approved by the Secretary of Housing and Urban Development pursuant to sections 203 and 211 of the National Housing Act, a savings and loan association, a savings bank, a commercial bank, credit union, insurance company or similar institution which is supervised and examined by a federal or state authority.

57.    Contrary to Defendants' representations and assurances, Defendants did not tender the loans to DLJ and DLJ did not "cure," "repurchase" or "substitute".

58.    Furthermore, Defendants failed to tender to DLJ the defaulted mortgage loans resulting from their misrepresentations and omissions. Instead, mortgage loan fraud losses were wrongfully charged to the over-collaterization account and to Security I-B-2 and Security I-B-3 as a result of Defendants' intentional and reckless disregard of their obligations and duties, all resulting in prejudice to BANKERS. Specifically, Defendants claimed the mortgage loans to be "fraudulent" but have refused to list, describe, or in any way make BANKERS aware of criteria used to make their determination of "fraud" despite repeated requests by BANKERS.

59.    The exact principal amount of coverage under the TGIC insurance coverage and the status of any claims, have not been made available to BANKERS despite repeated requests to the Defendants.

60.    Defendants made the foregoing representations with full knowledge of BANKERS' reliance thereon and with full knowledge of the inferior and inadequate underwriting standards for the subject mortgage loans.

61.    BANKERS materially relied on the existence of the TGIC insurance coverage in purchasing Securities I-B-2 and I-B-3, in that it constituted a material and realistic protection against losses caused by defaulted mortgage loans of lesser credit quality improperly included in the mortgage pool.

62.    In fact, the TGIC insurance coverage was illusory and allowed TGIC to unilaterally declare mortgage loans to be fraudulent and not subject to insurance coverage. Moreover, TGIC has failed and refused to divulge the criteria used in declaring the mortgage loans to be "fraudulent" and, therefore, not subject to the promised insurance coverage relied

upon by BANKERS. Despite repeated requests by BANKERS, TGIC has failed and refused to discharge its clear and express insurance coverage obligations to BANKERS.

63.     BoNY was responsible for, and obligated to disclose to BANKERS, the number and principal amount of claims submitted and claims paid under the TGIC policy during the preceding calendar month and the number and principal amount of claims paid under the TGIC policy.

64.     Despite repeated requests, BANKERS has never received the foregoing insurance claim information, and the foregoing refusal and failure is reflected by the following excerpt from the current trustee's monthly statement dated March 26, 2007, to BANKERS, which provided no claim information for the TGIC policy:

xiv)    Claims under TGIC PMI Policy:

|  | Current Month* | Aggregate* |
|---|---|---|
| Claims Submitted: Number | 0 | 0 |
| Principal Balance | $0.00 | $0.00 |
| Claims Paid:  Number | 0 | 0 |
| Principal Balance | $0.00 | $0.00 |

*NOT PROVIDED BY SERVICER

65.     The failure to provide the promised mortgage loan insurance and to divulge the disallowed insurance claims have increased BANKERS' losses far beyond what they would have been had these claims  been covered as promised and/or had the full information been properly divulged.

66.     The foregoing misconduct is further evidence of the concerted scheme by Defendants to camouflage the above-described improprieties.

67.    Had Defendants performed all of their obligations, had the foregoing misrepresentations not been made, and had all material facts been properly disclosed, BANKERS would have been on notice of the foregoing misrepresentations and omissions and would not have purchased the Securities.

68.    BANKERS' losses would have been avoided had the underwriting standards met the material representations and warranties made to BANKERS, had the servicing obligations been performed, had TGIC honored the mortgage insurance guaranty obligations promised to BANKERS and had BoNY not facilitated, aided and abetted the numerous misrepresentations and omissions made to BANKERS.

69.    The foregoing scheme created, nurtured and fostered a flow of defective and fraudulent mortgage loans to CSFB, inasmuch as CSFB had the reputation in the relevant market that it would purchase any mortgage loan since no due diligence would be performed.

70.    BANKERS will rely, in part, on the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made material misrepresentations to BANKERS, the public at large and the regulatory bodies;

(b)    The Securities were traded in an efficient market;

(c)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Securities;

(d)    BANKERS purchased the Securities between the time that the Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted fact; and

{216030.0001/N0651670_1}

18

(e) Defendants communicated with public investors via established market communication mechanisms, including press releases and other public disclosures, such as communications with reporting services, communications through e-mail and communications to the SEC.

71. As a result, the market for the Securities digested current information regarding the Securities from the publicly available sources described above and reflected such information in the price of the Securities. Where a security is traded, in an efficient market, material news concerning the security has an effect on its market price. At the time BANKERS purchased the Securities, BANKERS was without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts. As a result, the presumption of reliance applies.

72. BANKERS has retained the undersigned counsel to represent its interests in connection with this matter and is obligated to pay undersigned counsel reasonable attorneys' fees and costs.

73. All conditions precedent to the institution of this action have occurred, been excused, satisfied or otherwise waived.

### AS AND FOR A FIRST
### CAUSE OF ACTION
### (Negligent Misrepresentation)

74. BANKERS repeats and realleges each and every allegation contained in Paragraphs "1" through "73" above, with the same force and effect as if set forth fully herein.

75. As more fully described above, Defendants made misrepresentations of material fact to BANKERS and omitted material facts to BANKERS in connection with the Transaction and the purchase by BANKERS of Security I-B-2 and Security I-B-3.

{216030.0001/N0651670_1}

19

76.     The representations made by Defendants concerning material facts, were false and misleading, and Defendants knew or should have known of their falsity.

77.     Defendants further failed to use reasonable care when supplying the false information to BANKERS and knew or should have known that the information was to be used by BANKERS to purchase the Securities more fully described above.

78.     Defendants made the foregoing misrepresentations and/or omissions with the intent to influence BANKERS to purchase the Securities.

79.     BANKERS reasonably and justifiably relied on the false statements made by Defendants and purchased Security I-B-2 and Security I-B-3.

80.     But for Defendants' misrepresentations, BANKERS would not have purchased Security I-B-2 and Security I-B-3.

81.     As a direct and proximate result of Defendants' negligent misrepresentations, Defendants have caused BANKERS to incur substantial monetary damages.

82.     Defendants' actions as more fully described above were willful, oppressive and malicious; therefore BANKERS reserves its right to bring a claim for punitive damages pursuant to Section 768.72, Florida Statutes.

### AS AND FOR A SECOND
### CAUSE OF ACTION
### (Common Law Fraud)

83.     BANKERS repeats and realleges each and every allegation contained in Paragraphs "1" through "73" above, with the same force and effect as if set forth fully herein.

84.     Defendants created and implemented the foregoing scheme and made the misrepresentations and/omissions of material fact, more fully described above, in an effort to induce BANKERS to purchase Security I-B-2 and Security I-B-3.

{216030.0001/N0651670_1}

85.     Defendants knowingly and/or recklessly made the foregoing misrepresentations and omissions of material fact to BANKERS.

86.     Each of these representations and/or omissions were material to BANKERS, operated as a fraud on BANKERS, and BANKERS would not have purchased the Securities had the true facts been disclosed.

87.     BANKERS relied, to its detriment, on the false and misleading nature of the foregoing misrepresentations and omissions made by the Defendants and the Defendants were aware of such reliance by BANKERS.

88.     As a direct and proximate cause of BANKERS' reliance on Defendants' representations and/or omissions, as more fully described above, BANKERS has been irreparably damaged, having suffered losses in an amount to be subsequently determined, exclusive of interest, dividends and costs.

89.     Defendants' actions as more-fully described above were willful, oppressive and malicious, therefore BANKERS reserves its right to bring a claim for punitive damages pursuant to Section 768.72, Florida Statutes.

## AS AND FOR A THIRD
## CAUSE OF ACTION
### (Breach of Fiduciary Duty)

90.     BANKERS repeats and realleges each and every allegation contained in Paragraphs "1" through "73" above, with the same force and effect as if set forth fully herein.

91.     Defendants offered and sold securities to BANKERS in the State of Florida and, by virtue of their relationship to BANKERS and the investing public at large, owed a fiduciary duty to BANKERS.

92.     Defendants, their officers, agents and employees, held themselves out to BANKERS as having knowledge and expertise in the area of ABS and sought to obtain

{216030.0001/N0651670_1}

BANKERS' trust, confidence and reliance, and thus, owed BANKERS a fiduciary duty of full disclosure, honesty and complete candor and loyalty in their dealings.

93.    Defendants knew, or reasonably should have known, that BANKERS would be relying on the information being disseminated regarding the Securities.

94.    Defendants owed BANKERS the duty to make full disclosure of all material facts necessary for BANKERS to make informed investment decisions.

95.    Defendants owed BANKERS a fiduciary duty to act in a fair, honest, just, trustworthy and equitable manner.

96.    Defendants breached their fiduciary duties to BANKERS in a willful, reckless and negligent manner by undertaking to harm BANKERS, by making misrepresentations of material fact and omitting material facts that caused substantial losses to BANKERS.

97.    As a direct and proximate result of the foregoing, BANKERS has been substantially damaged in an amount to be subsequently determined.

98.    Defendants' actions were willful, oppressive and malicious, therefore BANKERS reserves its right to bring a claim for punitive damages pursuant to Section 768.72, Florida Statutes.

### AS AND FOR A FOURTH
### CAUSE OF ACTION
### (Violations of the Securities and Exchange Act of 1934 and
### Rule 10b-5 Promulgated thereunder Against CSFB)

99.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs "1" through "73" above, with the same force and effect as if set forth fully herein.

100.    CSFB carried out a plan, scheme and/or course of conduct which was intended to, and did manipulate and inflate the value of the Securities by making the material misrepresentations and/or omissions more fully described above.

{216030.0001/N0651670_1}

101. CSFB, in furtherance of this scheme, (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; (c) engaged in acts, practices or a course of conduct which operated as a fraud and deceit upon the purchasers of the Securities, including BANKERS, in violation of Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

102. CSFB had a duty to disclose to BANKERS, and, as well, the general public accurate information that would be material to the investors in compliance with the integrated disclosure provisions of the SEC as embodied in Regulation S-X (17 C.F.R. §210.01 *et. seq.*) and other SEC regulations including accurate and truthful information concerning the Securities.

103. CSFB, directly and indirectly, by use of means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a course of conduct to defraud BANKERS and other purchasers of the Securities, as set forth more particularly above, and engaged in transactions, practices and a course of conduct which operated as a fraud and deceit upon BANKERS.

104. CSFB had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, and/or acted with reckless disregard for the truth in that it failed to ascertain and to disclose such facts, even though they were readily available.

105. As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, BANKERS has been irreparably injured and its Securities rendered substantially valueless. Unaware of the foregoing scheme to defraud, and relying on the foregoing false and misleading statements and/or on the absence of material,

adverse information known to or recklessly disregarded by the CSFB, BANKERS was damaged thereby.

106.    At the time said misrepresentations were made, BANKERS was unaware of their falsity and believed them to be true.

107.    By virtue of the foregoing, CSFB violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder.

108.    As a direct and proximate result of CSFB's wrongful conduct, BANKERS has suffered substantial damages in connection with its acquisition of the Securities.

## AS AND FOR A FIFTH
## CAUSE OF ACTION
### (Violations of Section 12(A)(2) of the Securities Act of 1933 Against CSFB)

109.    Plaintiff repeats and realleges each and every allegation contained in Paragraphs "1" through "73" above, with the same force and effect as if set forth fully herein.

110.    CSFB carried out a plan, scheme and/or course of conduct which was intended to, and did manipulate and inflate the value of the Securities by making the material misrepresentations and/or omissions more fully described above.

111.    The representations made by CSFB concerning the forgoing investments including, without limitation, the capitalization, financial condition and results of operation prior to the Transaction and the issuance of the Offering Memorandum, contained untrue statements of material fact and omitted to state other material facts necessary to make the statements made not misleading.

112.    CSFB had a duty to make a reasonable and diligent investigation of the statements made to the public and in the Offering Memorandum to insure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements not misleading.

{216030.0001/N0651670_1}

24

113.   BANKERS purchased the Securities pursuant to, among other things, the representations of CSFB, and did not know, or in the exercise of reasonable diligence could not have known, of the untruths and omissions made by CSFB.

114.   By virtue of the foregoing, CSFB violated Section 12(A)(2) of the 1933 Act.

115.   As a direct and proximate result of CSFB's wrongful conduct, BANKERS has suffered substantial damages in connection with its acquisition of the Securities.

### AS AND FOR A SIXTH
### CAUSE OF ACTION
### (Breach of Third Party Beneficiary Contract Against TGIC and BONY)

116.   Plaintiff repeats and realleges each and every allegation contained in Paragraphs "1" through "73" above, with the same force and effect as if set forth fully herein.

117.   BONY and TGIC entered into an agreement whereby TGIC was to provide mortgage loan guaranty insurance to protect and indemnify the Securities.  A true and correct copy of the TGIC agreement is attached hereto as Exhibit "A".

118.   The foregoing agreement to provide mortgage loan guaranty insurance was for the intended benefit of BANKERS.

119.   The foregoing agreement to provide mortgage loan guaranty insurance was breached by BONY and TGIC as more fully set forth above.

120.   As a direct and proximate result of BONY's and TGIC's breach of the agreement to provide mortgage loan guaranty insurance, BANKERS has suffered damage.

### AS AND FOR A SEVENTH
### CAUSE OF ACTION
### (Violation of Florida Statutes, Chapter 517 Against CSFB)

121.   Plaintiff repeats and realleges each and every allegation contained in Paragraphs "1" through "73" above, with the same force and effect as if set forth fully herein.

{216030.0001/N0651670_1}

122.  This is an action pursuant to Chapter 517, known as "Florida's Securities and Investor Protection Act."

123.  Section 517.301, Florida Statutes, in pertinent part states:

 (1)  It is unlawful and a violation of the provisions of this Chapter for a person:

  (a)  in connection with the rendering of any investment advice or in connection with the offer, sale or purchase of any instrument or security:

   1.  to employ any device, scheme or artifice to defraud;

   2.  to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; or

   3.  to engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon a person.

124.  As more fully described above, CSFB carried out a plan, scheme and/or course of conduct which was intended to, and did manipulate and inflate the value of the Securities by making the material misrepresentations and/or omissions more fully described above.

125.  CSFB (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; (c) engaged in acts, practices or a course of conduct which operated as a fraud and deceit upon the purchasers of the Securities in violation of Chapter 517, Florida Statutes.

126.  CSFB had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that it failed to ascertain and to disclose such facts, even though they were readily available.

127.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the purchasers of the Securities have been irreparably injured and their Securities rendered valueless.

128.   Unaware of the foregoing scheme to defraud by CSFB, and relying on the false and misleading statements and/or on the absence of material adverse information known to or recklessly disregarded by CSFB, BANKERS was damaged.

129.   At the time said misrepresentations were made, BANKERS was unaware of their falsity and believed them to be true.

130.   By virtue of the foregoing, CSFB violated Chapter 517, Florida Statutes.

131.   As a direct and proximate result of CSFB's wrongful conduct, BANKERS suffered substantial damages.

### AS AND FOR A EIGHTH
### CAUSE OF ACTION
#### (Civil Conspiracy Against all Defendants)

132.   Plaintiff repeats and realleges each and every allegation contained in Paragraphs "1" through "73" above, with the same force and effect as if set forth fully herein.

133.   All of the Defendants, acting in concert with one another, conspired and agreed to (i) develop and implement the foregoing scheme to defraud; and (ii) make the material misrepresentations set forth above.

134.   As a result, Defendants obtained the power to accomplish the unlawful purpose which they could not possess alone.

135.   As a direct and proximate result of the foregoing, BANKERS has suffered substantial damages.

**WHEREFORE,** Plaintiffs demand judgment against the Defendants as follows:

A.      As to the First Cause of Action, rescission and/or damages in an amount to be established at trial together with interest thereon, pre-judgment and post-judgment interest;

B.      As to the Second Cause of Action, rescission and/or damages in an amount to be established at trial together with interest thereon, pre-judgment and post-judgment interest;

C.      As to the Third Cause of Action, rescission and/or damages in an amount to be established at trial together with interest thereon, pre-judgment and post-judgment interest;

D.      As to the Fourth Cause of Action, rescission and/or damages in an amount to be established at trial together with interest thereon, pre-judgment and post-judgment interest;

E.      As to the Fifth Cause of Action, rescission and/or damages in an amount to be established at trial together with interest thereon, pre-judgment and post-judgment interest;

F.      As to the Sixth Cause of Action, rescission and/or damages in an amount to be established at trial together with interest thereon, pre-judgment and post-judgment interest;

G.      As to the Seventh Cause of Action, rescission and/or damages in an amount to be established at trial together with interest thereon, pre-judgment and post-judgment interest;

H.      As to the Eighth Cause of Action, rescission and/or damages in an amount to be established at trial together with interest thereon, pre-judgment and post-judgment interest;

I.      As to the First through Fourth Causes of Action and the Sixth through Eighth Causes of Action, an award of punitive damages;

J.      As to all Causes of Action, attorneys' fees and costs pursuant to the applicable agreements and/or statutes at issue herein, including but not limited to, Chapter 517, Florida Statutes, the Securities Act of 1933 and the Securities and Exchange Act of 1934;

K.      Such other and further relief as to this Court may deem just and proper; and

{216030.0001/N0651670_1}

L.    As to all Causes of Action, where applicable, a trial by jury.


Dated: April 20, 2007                        Respectfully submitted,
       Fort Lauderdale, FL 33301

                                             _____

                                             ADAM HODKIN
                                             Florida Bar No. 962597
                                             e-mail – Hodkin@thkolaw.com
                                             The Hodkin Kopelowitz
                                             Ostrow Firm, P.A.
                                             350 East Las Olas Boulevard
                                             Suite 980
                                             Telephone:    (954) 525 4100
                                             Facsimile:    (954) 525 4300
                                             Co-Counsel for Plaintiff

                                             _____

                                             DALE LEDBETTER
                                             Florida Bar No. 0948411
                                             e-mail – dledbetter@dlsecuritieslaw.com
                                             Ledbetter & Associates, P.A.
                                             350 East Las Olas Boulevard
                                             Suite 1220
                                             Fort Lauderdale, FL 33301
                                             Telephone:    (954) 766 7875
                                             Facsimile:    (954) 766 7800
                                             Co-Counsel for Plaintiff