BANKERS LIFE INSURANCE COMPANY,      Case No. 8:07-CV-00690-EAK-MSS

      Plaintiff,

vs.

CREDIT SUISSE FIRST BOSTON
CORPORATION, also known as Credit Suisse
Securities (USA) LLC, *et al.*,

      Defendants.
_____/

## MOTION OF CREDIT SUISSE SECURITIES (USA) LLC, CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP., DLJ MORTGAGE CAPITAL, INC. AND SELECT PORTFOLIO SERVICING, INC. TO DISMISS THE AMENDED COMPLAINT, AND INCORPORATED MEMORANDUM OF LAW

      Credit Suisse Securities (USA) LLC, formerly known as Credit Suisse First Boston Corporation ("Credit Suisse"), Credit Suisse First Boston Mortgage Securities Corp. ("Credit Suisse Mortgage"), DLJ Mortgage Capital, Inc. ("DLJ") and Select Portfolio Servicing, Inc. ("SPS") (collectively, the "Credit Suisse Defendants"), respectfully submit this motion to dismiss and incorporated memorandum of law in support of their motion to dismiss the Amended Complaint filed by plaintiff Bankers Life Insurance Company ("Bankers").

      As demonstrated below, each of the tort claims should be dismissed with prejudice for multiple, independently sufficient reasons. The claims for negligent misrepresentation and false information negligently supplied for the guidance of others (Counts I, II, V and VI) should be dismissed for failure to properly allege the requisite relationship and actual, reasonable reliance. *See* Argument Point I.A at 11-14. The claims for common law fraud (Counts III and VII) should be dismissed for failure to properly allege actual, reasonable

reliance, scienter and proximate cause. *See* Argument Point I.B at 14-16. The claims for breach of fiduciary duty (Counts IV and X) should be dismissed under the shotgun pleading doctrine and for failure to properly allege a duty. *See* Argument Point I.C at 16-17. The fiduciary duty claim against SPS also should be dismissed because a written contract governs Bankers' rights and SPS's responsibilities. *Id.* The claim for civil conspiracy (Count XVII) should be dismissed as a shotgun pleading, because there is no actionable underlying tort, and for failure to plead facts demonstrating an agreement and an overt act. *See* Argument Point I.D at 17-18.

Each of the breach of contract claims (Counts IX, XI, XII and XIII) likewise should be dismissed with prejudice for multiple, independently sufficient reasons. As a threshold matter, Bankers has no standing to assert them and, in any event, they are barred under the exculpatory clause of the relevant contract. *See* Argument Points II.A & II.D at 19, 24. The breach of contract claims also should be dismissed for failure to properly allege supporting facts and because the allegations fail under the express terms of the relevant contract. *See* Argument Points II.B & II.C at 20-23.

## PROCEDURAL HISTORY

Bankers commenced this action on April 23, 2007, asserting claims against the Credit Suisse Defendants for violations of federal and Florida securities laws, common law fraud, negligent misrepresentation, breach of fiduciary duty and civil conspiracy. On June 22, 2007, the Credit Suisse Defendants filed and served their motion to dismiss the complaint in its entirety. Bankers did not attempt to defend its allegations against the motion to dismiss, and instead requested an extension of time to file and serve an amended complaint. On August 27, 2007, Bankers filed its Amended Complaint, which abandons wholesale all of its federal and state securities law claims. The Amended Complaint attempts to replead Bankers' common law claims and also asserts claims for breach of contract.

# RELEVANT FACTS

## I.     THE DISPUTED TRANSACTION

### A.     Overview Of The Dispute

This case involves CSFB Mortgage-Backed Pass-Through Certificates, Series 2001-28 (the "Certificates"), which were issued by a trust formed by Credit Suisse Mortgage (the "Trust"). S. Pr. at S-17.[1] The Certificates were underwritten by Credit Suisse in November, 2001 as part of a structured finance transaction in which a large number of mortgage loans were pooled together and then placed in the Trust. Am. Compl. ¶¶ 7, 15, 18. The Trust then issued various types of interests (documented by the Certificates) in the cash flows from that pool of mortgage loans which were typically sold to sophisticated investors such as Bankers. S. Pr. at S-1, S-6, S-39-55. The Certificates have differing entitlements to payment from the Trust, with the more subordinated (riskiest) Certificates generally being entitled to payment from the Trust only after the other more senior Certificateholders had been paid. S. Pr. at S-7, S-39-55. The degree to which the Certificates turn out to be successful investments (particularly for holders of the more subordinated Certificates) depends on how well the underlying pool of mortgage loans performs, which in turn is directly related to the general state of the U.S. housing market.

In January and February 2004 (more than two years after the Certificates were issued), plaintiff Bankers purchased more than $1.4 million of subordinated Certificates in the secondary market from unidentified third parties (not the Credit Suisse Defendants). Am. Compl. ¶¶ 28, 28 n.5. The Amended Complaint does not allege that Bankers had any contact whatsoever with, or read the offering documents or any other information from, any of the Credit Suisse Defendants in connection with making or carrying out its investment decision. The

---

[1]     The October 23, 2001 Prospectus ("Pr."), the November 29, 2001 Supplemental Prospectus ("S. Pr."), the November 1, 2001 Pooling and Servicing Agreement ("PSA") and the Trustee's December 26, 2001 Statement to Certificateholders ("Tr. Stmt.") are attached to the Amended Complaint as Exhibits A, B, C and D, respectively. Accordingly, the Court may consider these documents on this motion to dismiss. *See, e.g., Frenck v. Corr. Corp. of Am.*, No. 06-CV-1534, 2006 WL 3147656, at *2 (M.D. Fla. Nov. 1, 2006).

subordinated Certificates purchased by Bankers have both a higher level of risk and a higher level of potential return. S. Pr. at S-6, S-15, S-52, S-67. Indeed, at the time of the offering, the subordinated Certificates purchased by Bankers had a rate of return <u>two-and-a-half times higher</u> than the least risky Certificates. S. Pr. at S-6.

According to the Amended Complaint, the Certificates purchased by Bankers began to decline in value approximately one year after acquisition. Am. Compl. ¶¶ 32, 32 n.6. That decline, however, is entirely consistent with the disclosures made in the offering documents. Those documents clearly state that a decline in the real estate market will adversely affect the value of the Certificates. S. Pr. at S-10-12. They also state that the ratings of the Certificates may be lowered by the rating agencies if the performance of the mortgage loans is less than expected and that such an action would negatively impact the value of the Certificates. Pr. at 102; S. Pr. at S-9, S-72-73.

## B. <u>Structure Of The Transaction</u>

As discussed above, the Certificates were issued in connection with a residential mortgage structured finance transaction. First, Credit Suisse Mortgage acquired from DLJ a pool of mortgage loans with an aggregate principal balance of approximately $300 million. S. Pr. at S-17. DLJ previously acquired the mortgage loans from various loan originators. S. Pr. at S-17. Credit Suisse Mortgage then conveyed the mortgage loans to the Trust and received in return the Certificates evidencing various interests in the Trust pursuant to the November 1, 2001 PSA attached to the Amended Complaint. PSA § 2:01, S. Pr. at S-17, S-39. Credit Suisse Mortgage then sold all the Certificates at a set price to Credit Suisse, which acted as underwriter and, in turn, sold them to initial investors in individually-negotiated transactions. S. Pr. at S-72.

The Certificateholders have certain rights to distributions of amounts collected on the mortgage loans by the Trust. S. Pr. at S-6-8, S-39-67. The interests in the Trust are divided into multiple classes (often called "tranches"). S. Pr. at S-6. Each tranche has a unique position

in the Trust's hierarchy of payments (*i.e.*, who gets paid first, second, etc.), which is known as the "waterfall." S. Pr. at S-6-8, S-39-67. The tranches that are entitled to receive distributions first generally bear less risk than the tranches lower down the waterfall. S. Pr. at S-6-16, S-39-67. This transaction has 11 tranches of offered Certificates. S. Pr. at S-6. The rights attendant to each of the tranches are set forth in detail in the Supplemental Prospectus. S. Pr. at S-39-67.

It is common in these transactions to have the various tranches of certificates "rated" by one or more of the larger independent rating agencies such as Moody's Investors Service ("Moody's"), Standard & Poor's or Fitch Ratings. The subordinated tranches of Certificates in this transaction were rated by Moody's. S. Pr. at S-6, S-72-73. Both the Prospectus and the Supplemental Prospectus fully disclose that the ratings given to the various tranches of Certificates are in the sole judgment of the rating agencies, not the Credit Suisse Defendants, and may change from time to time. Pr. at 102; S. Pr. at S-9, S-72-73.

### C.  The Underlying Mortgage Loans

The underlying pool of mortgage loans is the primary asset of the Trust. Pr. at 1; S. Pr. at S-5, S-17. The Supplemental Prospectus sets forth detailed, numerical data on these mortgage loans regarding, among other things, the interest rates, the types of properties securing the loans, the purpose for which the loans were made, the original loan-to-value ratio, how much time had passed since origination of the loans, where the mortgaged properties were located, the distribution of credit scores of the borrowers, and the amount and nature of the documentation required from the borrowers. S. Pr. at S-24-30. For the adjustable mortgage loans (which were less than 12% of the pool), the Supplemental Prospectus sets forth additional detailed information regarding the interest rate, including the frequency of rate adjustments, the maximum rates, and the existence of any rate caps or rate floors. S. Pr. at S-18-19.

The mortgage pool has "servicers" who, among other things, are responsible for various administrative activities relating to the underlying mortgage loans.[2] The obligations of the servicers are set forth in the PSA, and information regarding them and their role is fully disclosed in the Supplemental Prospectus. PSA Article III; S. Pr. at S-33-39. The Trustee is generally responsible for, among other things, distributing payments to, and protecting the interests of, the Certificateholders. PSA §§ 2.01-02, 9.01-02. The specific rights and duties of the Trustee in administering the Trust are set forth in the PSA and fully disclosed in the Supplemental Prospectus. PSA §§ 9.01-14; S. Pr. at S-17, S-32-33, S-55. Included among these duties is the Trustee's obligation to make certain information available to Certificateholders on a monthly basis in a Statement to Certificateholders, a sample of which is attached to the Amended Complaint. S. Pr. at S-55; Tr. Stmt. In connection with this transaction, Triad Guaranty Insurance Corporation ("TGIC") issued a mortgage guaranty insurance policy ("TGIC Policy") that insured certain of the mortgage loans for certain types of losses, up to a set maximum amount. The details of that insurance coverage are set out in the TGIC Policy attached to the Amended Complaint and fully disclosed in the Supplemental Prospectus. S. Pr. at S-19-21.

### D. The Subordinated Certificates Purchased By Bankers

In January and February 2004, Bankers purchased Class I-B-2 and I-B-3 Certificates in the secondary market (the "Subordinated Certificates"). Am. Compl. ¶ 28. As disclosed in the Supplemental Prospectus, Class I-B-2 and I-B-3 Certificates were subordinated to approximately 99 percent of all the Certificates offered publicly for sale and, thus, were among the riskiest Certificates offered. S. Pr. at S-1, S-6, S-67. The Prospectus and the Supplemental Prospectus fully identify the risk factors attendant to investing in the Subordinated Certificates, including, among other things, that returns will depend on how many of the

---

[2] The original servicers for the mortgage loans were Vesta Servicing, L.P. and Washington Mutual Mortgage Securities Corp. S. Pr. at S-33-34. Defendant SPS assumed the role of servicer from these two companies in or about December, 2002.

mortgage loans prepay (and therefore are no longer in the pool), and on how many of the mortgage loans default and the recovery rate on such defaults.  S. Pr. at S-10-16.

Under the heading "Risk Factors," the Supplemental Prospectus specifically sets forth:

> **The return on your certificates may be affected by losses on the mortgage loans, which could occur for a variety of reasons.**
>
> Losses on the mortgage loans may occur due to a wide variety of causes, including a decline in real estate values, and adverse changes in the borrower's financial condition.  A decline in real estate values or economic conditions nationally or in the regions where the mortgaged properties are concentrated may increase the risk of losses on the mortgage loans.

S. Pr. at S-10 (emphasis in original).

> **The value of your certificate may be reduced if losses are higher than expected**
>
> If the performance of the mortgage loans is substantially worse than assumed by the rating agencies, the ratings of any class of related certificates may be lowered in the future.  This would probably reduce the value of those certificates.

S. Pr. at S-11 (emphasis in original).

The Supplemental Prospectus also specifically discusses the heightened risk for holders of the Subordinated Certificates.  S. Pr. at S-15, S-52, S-67.  The holders of the Subordinated Certificates, including Bankers, were compensated for this risk with a significantly higher rate of return.  The subordinated Certificates purchased by Bankers paid interest at the fixed rate of 7.75%.  The least risky Certificates gave those holders interest at the rate of only 2.76% at the time of issuance.  S. Pr. at S-6.  Thus, the rate of return on the Subordinated Certificates was two-and-a-half times that of the least risky Certificates at the time of issuance.[3]

---

[3]      After the first payment, the least risky Certificates were paid interest at a floating rate of 0.65% over the rates for one-month LIBOR for dollar deposits.  S.Pr. at S-6, S-50.  On November 30, 2001, the one-month LIBOR for dollar deposits was 2.11875%.  *Money Rates*, Wall St. J., Dec. 3, 2001.  Courts may take judicial notice of "facts that are not subject to dispute because they are capable of accurate and

## II.     ALLEGATIONS AGAINST THE CREDIT SUISSE DEFENDANTS

Bankers' allegations against the Credit Suisse Defendants fall into the three categories set forth below.

***Alleged Misrepresentation Concerning the Transaction.***     Bankers points to a single allegedly misleading statement made in connection with the issuance of the Certificates. Am. Compl. ¶¶ 19-20.  The Supplemental Prospectus provides that "[n]o mortgage loan will be delinquent more than 30 days as of the cut-off date" (the "Cut-Off Date Statement").  S. Pr. at S-19.  The "cut-off date" is defined in the Supplemental Prospectus as November 1, 2001.  S. Pr. at S-5.  The Amended Complaint alleges that this statement was false based on the December 26, 2001 Trustee Statement.  Am. Compl. ¶ 20.  Although Bankers purchased the Subordinated Certificates over two years after the Supplemental Prospectus was issued (and after 24 Trustee Statements providing updated information had been issued), it nevertheless relies on this allegation to support its claims for negligent misrepresentation and false information negligently supplied against Credit Suisse (Counts I and II, respectively) and Credit Suisse Mortgage (Counts V and VI, respectively).  Bankers also relies on this allegation (and no others) to support its claim for common law fraud claim against Credit Suisse Mortgage (Count VII).

***Alleged Omissions Regarding Post-Offering Events.***     Bankers alleges that it would not have purchased the Certificates in early 2004 if the Supplemental Prospectus, the Prospectus and the PSA had been updated to reflect certain events that allegedly transpired after the issuance of the Certificates in November 2001.  These post-offering allegations are contained in paragraphs 29-30, 39 and 51 of the Amended Complaint.  Specifically, Bankers alleges that these documents should have been updated to reflect: (i) that TGIC denied insurance coverage on a "substantial portion" of the underlying mortgage loans; (ii) that neither SPS nor the Trustee pursued their legal remedies against TGIC for denying coverage; (iii) that neither SPS nor the

---

ready determination."  Fla. Stat. § 90.202(12) (2007); *see, e.g., City of Fort Lauderdale v. Town of Hacienda Village, Inc.*, 172 So. 2d 451, 452-53 (Fla. 1965).

Trustee enforced their rights against DLJ with respect to any nonconforming mortgage loans in the asset pool; and (iv) that the Trustee failed to provide mortgage loan and insurance coverage information to the rating agencies (collectively, the "alleged Post-Offering Omissions"). Am. Compl. ¶¶ 29, 30. Bankers relies on these allegations to support its negligent misrepresentation, false information negligently supplied and fraud claims against Credit Suisse only.

**_Alleged Post-Offering Conduct_.** The Amended Complaint also alleges that DLJ and SPS engaged in certain conduct resulting in the alleged breach of various provisions of the PSA. In paragraphs 23-26 of the Amended Complaint, Plaintiff alleges that DLJ knew or should have known that certain mortgage loans were delinquent for more than 30 days as of the cut-off date and that DLJ failed to take the steps outlined in Section 2.03 of the PSA to cure such breaches or substitute or repurchase the delinquent mortgage loans. Bankers relies on these allegations in support of its breach of contract claim against DLJ (Count IX). Bankers also alleges that SPS failed to (i) pursue insurance claims and foreclose on delinquent loans (Count XI); (ii) provide mortgage loan information to the Trustee (Count XII); and (iii) enforce DLJ's obligations set forth above (Count XIII). These allegations are sprinkled throughout the Amended Complaint in paragraphs 27, 29-30, 125-26, 130-32, 135-38.

## ARGUMENT

The Supreme Court in _Bell Atlantic Corp. v. Twombly_ recently set forth the Federal Rule 8(a)(2) standard a complaint must meet to survive a motion to dismiss under Federal Rule 12(b)(6):

> a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

127 S. Ct. 1955, 1964-65 (2007); *Trent v. Mortgage Elec. Registration Sys., Inc.*, No. 06-CV-374, 2007 WL 2120262, at *2 (M.D. Fla. July 20, 2007). Thus, the Supreme Court held that a motion to dismiss should be granted where the factual allegations do not "plausibly suggest[]" entitlement to relief. 127 S. Ct. at 1966.[4] Such a motion also should be granted where the factual allegations that are pled undermine the claims. *See Griffin Indus., Inc. v. Irvin*, — F.3d —, No. 06-12370, 2007 WL 2363343, at *13 (11th Cir. Aug. 21, 2007).

## I.    ALL OF THE TORT CLAIMS SHOULD BE DISMISSED AS A MATTER OF LAW

Bankers alleges the common law tort claims of negligent misrepresentation (Counts I & V), false information negligently supplied for the guidance of others (Counts II & VI), fraud (Counts III & VII), breach of fiduciary duty (Counts IV & X) and conspiracy (Count XVII). As a preliminary matter, it is unnecessary for this Court to engage in a conflict of laws analysis unless there is a material, outcome determinative conflict between the laws of the interested states. *Fioretti v. Mass. Gen. Life Ins. Co.*, 53 F.3d 1228, 1234 (11th Cir. 1995). As demonstrated below, all of Bankers' tort claims should be dismissed as a matter of law regardless of whether Florida or New York law is applied.[5]

---

[4]    In interpreting the appropriate pleading standard under Rule 8(a)(2) in *Bell Atlantic*, the Supreme Court officially "retired" the popular guideline from its earlier decision in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bell Atl. Corp.*, 127 S. Ct. at 1968-69.

[5]    If the Court determines a choice of law analysis is necessary, New York law should be applied to Bankers' tort claims because it is the state with the most significant relationship to the relevant events. *See* Restatement (Second) of Conflict of Laws § 148 (1971); *Trumpet Vine Invs., N.V. v. Union Capital Partners I, Inc.*, 92 F.3d 1110, 1115-16 (11th Cir. 1996). New York law also should be applied to Bankers' breach of contract claims. *Infra*, at 18 n.13.

**A.** **The Claims For Negligent Misrepresentation And False Information Negligently Supplied For The Guidance Of Others Against Credit Suisse And Credit Suisse Mortgage Should Be Dismissed As A Matter Of Law**

Bankers asserts claims for negligent misrepresentation and false information negligently supplied for the guidance of others against Credit Suisse (Counts I and II, respectively) and Credit Suisse Mortgage (Counts V and VI, respectively).[6] The claims against Credit Suisse assert identical allegations based on the Cut-Off Date Statement and the alleged Post-Offering Omissions. Am. Compl. ¶¶ 37-46 (negligent misrepresentation), 47-56 (false information). The claims against Credit Suisse Mortgage are based solely on the Cut-Off Date Statement. Am. Compl. ¶¶ 75-83 (negligent misrepresentation), 84-92 (false information). Bankers' negligent misrepresentation and false information claims against Credit Suisse and Credit Suisse Mortgage fail as a matter of law for several reasons, each of which provides a sufficient and independent basis to dismiss the claims.

First, whether evaluated under New York or Florida law, Bankers has not properly pled the requisite relationship between it and Credit Suisse or Credit Suisse Mortgage. To state a claim for negligent misrepresentation under New York law, Bankers must plead "a special or privity-like relationship imposing a duty on the defendant to impart correct information to the plaintiff." *J.A.O. Acquisition Corp. v. Stavitsky*, 8 N.Y.3d 144, 148 (2007). The Amended Complaint contains no facts concerning any contact whatsoever between Bankers and Credit Suisse or Credit Suisse Mortgage, much less a special or privity-like relationship. Indeed, Bankers effectively admits that no such relationship exists by alleging that it purchased

---

[6] "Information Negligently Supplied For The Guidance Of Others" is the title of the Restatement of Torts section setting forth the elements of a negligent misrepresentation claim and thus is nothing more than the Restatement's version of that cause of action. Restatement (Second) of Torts § 552 (1977). Florida has adopted Section 552 and therefore "negligent misrepresentation" and "false information negligently supplied for the guidance of others" are the same claim under Florida law. *Gilchrist Timber Co. v. ITT Rayonier, Inc.*, 696 So. 2d 334, 337 (Fla. 1997). New York does <u>not</u> follow the Restatement on negligent misrepresentation and, accordingly, there is no claim under New York law for "information negligently supplied for the guidance of others." *See Williams and Sons Erectors, Inc. v. S.C. Steel Corp.*, 983 F.2d 1176, 1181 (2d Cir. 1993).

the Subordinated Certificates from undisclosed third parties in the secondary market over two years after they were issued. Am. Compl. ¶¶ 28, 31.

To state a negligent misrepresentation claim under Florida law, Bankers must plead that it is a member of a "limited class" which these Credit Suisse Defendants knew and intended to reach. Restatement (Second) of Torts § 552 (1977); *see also Gilchrist Timber Co. v. ITT Rayonier, Inc.*, 696 So. 2d 334, 339 (Fla. 1997). Because Bankers cannot differentiate itself from the general investing public – and actually pleads that the alleged statements and omissions were made to the investing public (Am. Compl. ¶¶ 38-39, 41, 50-51, 76, 78, 87) – Bankers' claim also fails under Florida law. *See Morgan v. W.R. Grace & Co.*, 779 So. 2d 503, 506 (Fla. Dist. Ct. App. 2000); *see generally WM High Yield Fund v. O'Hanlon*, No. 04-CV-3423, 2005 WL 1017811, at *16 (E.D. Pa. May 13, 2005).[7]

Second, the negligent misrepresentation claims fail under both New York and Florida law because there are no factual allegations which, if true, would demonstrate the required elements of actual reliance. *See FSP, Inc. v. Societe Generale*, No. 02-CV-4786, 2005 WL 475986, at *13 (S.D.N.Y. Feb. 28, 2005); *Tambourine Comerico Int'l, S.A. v. Solowsky*, No. 06-CV-20682, 2007 WL 689466, at *6 (M.D. Fla. Mar. 4, 2007); *Orlando v. Kukielka*, 40 A.D.3d 829, 831 (N.Y. App. Div. 2007) (actual reliance also required in cases alleging only omissions). The Amended Complaint is devoid of any allegations that Bankers received and reviewed the Prospectus, the Supplemental Prospectus or any other information concerning the Subordinated Certificates received from Credit Suisse or Credit Suisse Mortgage. Bankers' bald, conclusory allegation that it "relied" (Am. Compl. ¶¶ 43, 54, 80, 90) is insufficient. *See FSP,*

---

[7] Bankers attempts in its false information claims (but not in its negligent misrepresentation claims) to plead around this shortcoming by alleging that the required "limited class" consists of "persons who are purchasers of the Certificates." Am. Compl. ¶¶ 48-49, 85-86. This post hoc view of what constitutes a limited class is unavailing because the class is measured as of the time the statements were disseminated. *See generally Wallace v. Sys. & Computer Tech. Corp.*, No. 95-CV-6303, 1997 WL 602808, at *23 (E.D. Pa. Sept. 22, 1997); *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 686 (S.D.N.Y. 1990).

*Inc.*, 2005 WL 475986, at *11-13; *Tambourine*, 2007 WL 689466, at *6. Because there are no allegations that Bankers read the relevant documents, it is equally insufficient for Bankers to claim (in ¶¶ 40, 52, 77, 88) that it would not have purchased the Subordinated Certificates had those disclosures contained information that allegedly was omitted. *See Eckstein v. Balcor Film Investors*, 58 F.3d 1162, 1170-71 (7th Cir. 1995) ("[p]eople who did not rely on what was *in* the [offering] materials cannot have relied on what was omitted") (emphasis in original).[8]

Third, Bankers has not pled facts demonstrating that any alleged reliance was reasonable. The Supplemental Prospectus was issued on November 29, 2001 and Bankers did not purchase the Subordinated Certificates until over two years later. It is unreasonable as a matter of law for a sophisticated party to rely on such stale information. *See, e.g., United Teacher Assocs. Ins. Co. v. Union Labor Life Ins. Co.*, 311 F. Supp. 2d 587, 598 (W.D. Tex. 2004), *vacated in part on other grounds*, 414 F.3d 558 (5th Cir. 2005); *In re Price*, 48 B.R. 211, 214-15 (Bankr. S.D. Fla. 1985). It is particularly unreasonable in this case because up-to-date information was available. Bankers had access to at least 24 Trustee Statements – and relies on one such Statement in its Amended Complaint – prior to its investment. Am. Compl. ¶ 20; Tr. Stmt. As demonstrated by the Statement attached to the Amended Complaint, these reports reflect: (i) Realized Loss or Writedown amounts, which under the PSA include mortgage loan liquidation proceeds; (ii) the number and aggregate stated principal balance of the underlying mortgage loans; (iii) payment advances made on the underlying mortgage loans; (iv) loan delinquency information; (v) insurance claims submitted and paid; and (vi) prepayment information. Tr. Stmt at 1-2. Given the existence of such detailed information on a monthly basis subsequent to the issuance of the Supplemental Prospectus, Bankers cannot as a matter of

---

[8]    In the original complaint, Bankers also averred reliance based on "fraud-on-the-market," but appears to have dropped that theory in the Amended Complaint. In any event, Bankers cannot establish reliance by alleging fraud-on-the-market because that theory does not apply to negligent misrepresentation or common law fraud. *See Butterworth v. Quick & Reilly, Inc.*, 998 F. Supp. 1404, 1410 (M.D. Fla. 1998).

law establish that it reasonably relied on the Cut-Off Statement. *See, e.g.*, *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 21-22 (2d Cir. 2000); *Gilchrist*, 696 So. 2d at 339. The Trustee Statements also are fatal to Bankers' allegations regarding the alleged Post-Offering Omissions. While Bankers alleges that Credit Suisse withheld certain information concerning the mortgage loans and insurance claims, the Trustee Statement attached to and relied on in the Amended Complaint demonstrates that this material was available to Bankers on a monthly basis from the Trustee. *See* Tr. Stmt. These Statements were also made available to the rating agencies under Section 4.04 of the PSA. Thus, Bankers' allegations that such information was not disclosed to the rating agencies is similarly unavailing. Am. Compl. ¶¶ 30, 39, 51.

Finally, there is no legal basis for Bankers' argument that Credit Suisse had a duty to update or "sticker" the Supplemental Prospectus to reflect events subsequent to issuance. A duty to update arises only in the context of federal securities law claims – which claims Bankers already has abandoned. New York and Florida do not recognize a duty to update or supplement in connection with a negligent misrepresentation claim.

### B. The Common Law Fraud Claims Against Credit Suisse And Credit Suisse Mortgage Should Be Dismissed As A Matter Of Law

Relying solely on generalized allegations of misstatements and omissions, Bankers alleges a common law fraud claim against Credit Suisse (Count III). Am. Compl. ¶¶ 57-65. Bankers also asserts a fraud claim against Credit Suisse Mortgage (Count VII) based on the Cut-Off Date Statement. Am. Compl. ¶¶ 93-101. These claims should be dismissed for several independently sufficient reasons.

First, both New York and Florida require factual allegations demonstrating scienter to maintain a fraud claim. *Butterworth v. Quick & Reilly, Inc.*, 998 F. Supp. 1404, 1411 (M.D. Fla. 1998); *N.Y. Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 318 (1995). Under Florida law, scienter requires factual allegations demonstrating bad faith on the part of the defendant. *Parker v. State of Fla. Bd. of Regents*, 724 So. 2d 163, 168-69 (Fla. Dist. Ct. App. 1998). Under New

York law, a plaintiff must adequately allege motive and opportunity to commit fraud, or specific facts giving rise to strong circumstantial evidence of conscious misbehavior or recklessness. *Hampshire Equity Partners, II, L.P. v. Teradyne, Inc.*, No. 04-CV-3318, 2005 WL 736217, at *3-4 (S.D.N.Y. Mar. 30, 2005), *aff'd*, 159 Fed. Appx. 317 (2d Cir. 2005). The most Bankers alleges is that the complained of actions were "willful, oppressive and malicious." Am. Compl. ¶¶ 65, 101. The use of a few fraud buzz words without any related facts is insufficient as a matter of law. *See Serova v. Teplen*, No. 05-CV-6748, 2006 WL 349624, at *6-8 (S.D.N.Y. Feb. 16, 2006).

Second, under both New York and Florida law, common law fraud requires factual allegations which, if true, would demonstrate actual, reasonable reliance. *In re Marsh & McLennan Cos. Sec. Litig.*, — F. Supp. 2d —, MDL No. 1744, 2006 WL 2057194, at *37 (S.D.N.Y. July 20, 2006); *Tambourine*, 2007 WL 689466, at *6; *Butterworth*, 998 F. Supp. at 1410. For the same reasons it could not establish actual, reasonable reliance with respect to its negligent misrepresentation claims, Bankers cannot do so here. *See Clark v. Nevis Capital Mgmt., LLC*, No. 04-CV-2702, 2005 WL 488641, at *18 (S.D.N.Y. Mar. 2, 2005); *Tambourine*, 2007 WL 689466, at *6.

Third, Bankers must plead facts demonstrating that the particular alleged statement and omissions were in some reasonably direct way responsible for the loss and that the loss was "independent of other causes." *Bennett v. U.S. Trust Co. of N.Y.*, 770 F.2d 308, 315-16 (2d Cir. 1985); *Butterworth*, 998 F. Supp. at 1411. Courts have held this requires a plaintiff to allege "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the [investment]." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005); *see also Bastian v. Petren Res. Corp.*, 892 F.2d 680, 683-685 (7th Cir. 1990).[9] The Amended Complaint contains no allegations that it was the disclosure of the alleged

---

[9]    Courts have recognized that "when a plaintiff's loss coincides with a market-wide phenomenon causing comparable losses to other investors, the probability that the loss was caused by an alleged fraud

misstatement and omissions that caused the Subordinated Certificates to lose their value or that intervening events in the residential real estate market were not the cause of the losses.[10]

### C. The Breach Of Fiduciary Duty Claims Against Credit Suisse And SPS Should Be Dismissed As A Matter Of Law

Bankers asserts claims for breach of fiduciary duty against Credit Suisse (Count IV) and SPS (Count X). Am. Compl. ¶¶ 66-74 (Credit Suisse), 114-22 (SPS). As a threshold matter, these claims consist of nothing more than a boilerplate list of elements and a general statement that the claim "repeats and realleges each and every allegation contained in Paragraphs 1 through 37 above" (Compl. ¶¶ 66, 114), and therefore violate the "shotgun pleading" doctrine. *Wagner v. First Horizon Pharm. Corp.*, 464 F.3d 1273, 1279 (11th Cir. 2006). Given this pleading deficiency, the Court cannot find that Bankers' claims are "plausible" since it is impossible to determine which factual allegations in the Amended Complaint are meant to apply to the breach of fiduciary duty claims.

The claims also must be dismissed for failure to properly allege a duty. In order for Bankers to state a claim for breach of fiduciary duty against Credit Suisse Mortgage and SPS, there must be a relationship of trust and confidence. *See Mid-Island Hosp., Inc. v. Empire Blue*

---

decreases." *Hampshire Equity*, 2005 WL 736217, at *5 (citing *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 772 (2d Cir. 1994)); *see Bastian*, 892 F.2d at 684; *see also Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 343-47 (2005) (A "lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price.").

[10]  In addition, Bankers has not met the requirements of Rule 9(b) with respect to its fraud allegations against Credit Suisse. Under Rule 9(b), all averments of fraud must be pled with particularity. Fed. R. Civ. P. Rule 9(b); *Trenton Int'l, Ltd. V. Trenton Int'l, Inc.*, No. 05-CV-581, 2006 WL 3201869, at *1 (M.D. Fla. Nov. 6, 2006). For omissions, Rule 9(b) requires the complaint to set forth (1) precisely what . . . omissions were made, and (2) the time and place of each such [omission] and person responsible for . . . not making same, and (3) the content of such [omissions] and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud. *Trenton Int'l*, 2006 WL 3201869, at *1. To the extent Bankers is relying on any of the alleged "omissions," those allegations fail to satisfy Rule 9(b). Bankers pleads no facts whatsoever concerning the relevant time period nor does it allege facts identifying the information not disclosed in the monthly Trustee Statements.

*Cross & Blue Shield*, 276 F.3d 123, 130 (2d Cir. 2002); *Taylor Woodrow Homes Fla., Inc. v. 4/46-A Corp.*, 850 So. 2d 536, 540 (Fla. Dist. Ct. App. 2003). However, Bankers had absolutely <u>no</u> relationship with either Credit Suisse or SPS, and the Amended Complaint does not allege otherwise. Nor can Bankers claim that the Prospectus, Supplemental Prospectus, the PSA or any other statements made by Credit Suisse or SPS to the general investing public somehow created a direct "relationship" with Bankers. *See generally Brickman v. Tyco Toys, Inc.*, 722 F. Supp. 1054, 1063 (S.D.N.Y. 1989); *Sec. Investor Prot. Corp. v. BDO Seidman, L.L.P.*, 95 N.Y.2d 702, 712 (2001). Likewise, Bankers has not alleged (and cannot) that it reposed trust with these Credit Suisse Defendants that would give rise to a fiduciary duty. *See, e.g., Mid-Island Hosp.*, 276 F.3d at 130 (arms length commercial transactions do not suffice); *Am. Honda Motor Co. v. Motorcycle Info. Network, Inc.*, 390 F. Supp. 2d 1170, 1179-80 (M.D. Fla. 2005) (same).

The breach of fiduciary duty claim against SPS also is defective because claims based on post-offering conduct relating to servicing or administration of the underlying mortgage loans can only arise out of specific breaches of the PSA. It is well-established under both New York and Florida law that Bankers cannot repackage a breach of contract claim as a tort claim in an attempted end-run around the applicable contract – particularly where, as here, Bankers has asserted breach of contract claims.[11] *See Sommer v. Fed. Signal Corp.*, 79 N.Y.2d 540, 551 (1992); *Guilbert v. Gardner*, 480 F.3d 140, 148 (2d Cir. 2007); *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1316 (11th Cir. 2007); *Eye Care Int'l, Inc. v. Underhill*, 92 F. Supp. 2d 1310, 1315 (M.D. Fla. 2000).

**D.      The Civil Conspiracy Claim Against All Of The
Credit Suisse Defendants Should Be Dismissed As A Matter of Law**

Bankers asserts a claim for civil conspiracy against all of the Credit Suisse Defendants (Count XVII). Am. Compl. ¶¶ 162-66. The Amended Complaint alleges no specific

---

[11]      In addition, SPS did not become the servicer until December 2002 and therefore cannot be held accountable for conduct prior to that time.

facts upon which this claim is based and therefore this claim also must be dismissed as a shotgun pleading. *Supra,* at 16.

Moreover, as a general matter, a claim for civil conspiracy cannot exist without an actionable underlying tort.[12] *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006); *Williams v. Michelin N. Am., Inc.*, No. 04-CV-815, 2005 WL 2708308, at *2 (M.D. Fla. Oct. 21, 2005). As demonstrated above, there is no viable tort claim here and, therefore, the civil conspiracy claim fails as a matter of law. Even if there were an actionable underlying tort, the claim still must be dismissed because the Amended Complaint fails to plead facts demonstrating an agreement and overt act – both required elements under New York and Florida law. *See Fisk v. Letterman*, 424 F. Supp. 2d 670, 677 (S.D.N.Y. 2006); *Tucci v. Smoothie King Franchises, Inc.*, 215 F. Supp. 2d 1295, 1302 (M.D. Fla. 2002). The Amended Complaint alleges nothing more than the defendants "conspired and agreed" and "made overt acts." Am. Compl. ¶¶ 163-164. These conclusory, boilerplate allegations are insufficient as a matter of law. *See Crosby v. Tate & Kirlin Assocs., Inc.*, No. 07-CV-171, 2007 WL 2050944, at *2 (M.D. Fla. July 13, 2007); *Brownstone Inv. Group, LLC v. Levey*, 468 F. Supp. 2d 654, 661 (S.D.N.Y. 2007).

## II.     ALL OF THE BREACH OF CONTRACT CLAIMS SHOULD BE DISMISSED AS A MATTER OF LAW

Relying on various provisions of the PSA, Bankers asserts one claim against DLJ (Count IX) and three separate claims against SPS (Counts XI, XII and XIII) for breach of contract. Am. Compl. ¶¶ 109-113 (DLJ), 123-39 (SPS).[13]

---

[12]     Florida permits a civil conspiracy claim without an underlying tort in the very limited circumstances where the conspirators have "some peculiar power of coercion possessed . . . by virtue of their combination[.]" *Churruca v. Miami Jai-Alai, Inc.*, 353 So. 2d 547, 550 (Fla. 1977). This exception is not applicable here.

[13]     As a Certificateholder, Bankers is contractually bound by the terms, conditions and limitations set forth in the PSA. PSA Ex. C. (Form Class I-B Certificate); *see, e.g., Murray v. U.S. Bank Trust Nat'l Ass'n*, 365 F.3d 1284, 1289-93 (11th Cir. 2004); *Victor v. Riklis*, No. 91-CV-2827, 1992 WL 122911, at *6 (S.D.N.Y. May 15, 1992). Section 11.03 of the PSA contains a New York choice of law provision, and both Florida and New York enforce such clauses. *See LaSalle Bank Nat'l Ass'n v. Nomura Asset*

**A.  Bankers Has No Standing To Assert Its Breach Of Contract Claims**

Section 11.07 of the PSA expressly prohibits Certificateholders from pursuing a legal remedy "upon or under or with respect to" the Agreement unless the Certificateholder along with Certificateholders holding 25% of the voting rights for the Certificates provide notice of an Event of Default to the Trustee, along with a written request for the Trustee to commence an action, and the Trustee fails to act. Along with such request, the Certificateholder "shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses, and liabilities to be incurred." PSA § 11.07.

These "no-action" provisions are customarily found in indentures and other documents similar to the PSA, and are strictly construed and routinely enforced. *See, e.g., Murray v. U.S. Bank Trust Nat'l Ass'n*, 365 F.3d 1284, 1289-91 (11th Cir. 2004); *McMahan & Co. v. Wherehouse Entm't, Inc.*, 65 F.3d 1044, 1050-51 (2d Cir. 1995); *Victor v. Riklis*, No. 91-CV-2827, 1992 WL 122911, at *6 (S.D.N.Y. May 15, 1992). These clauses are designed to protect the collective economic interest of all holders of the financial instruments in question against the exercise of poor judgment by a single investor. *Feldbaum v. McCrory Corp.*, No. Civ. A. 11866, 1992 WL 119095, at *6 (Del. Ch. June 1, 1992). These clauses also ensure that the proceeds of any litigation are ratably shared among all the holders of the financial instruments. *Feldbaum*, 1992 WL 119095, at *6.

Bankers' attempt to circumvent this provision and secure its own recovery at the expense of the other Certificateholders should be rejected by this Court. At no point does the Amended Complaint allege, as it must, that Bankers submitted a written request to the Trustee, offered reasonable indemnity for costs and expenses, and secured the support of 25% of the other Certificateholders. Accordingly, Bankers has no standing to pursue any claims under the PSA.

---

*Capital Corp.*, 424 F.3d 195, 205 n.7 (2d Cir. 2005); *Gilman + Ciocia, Inc. v. Wetherald*, 885 So. 2d 900, 902 (Fla. Dist. Ct. App. 2004).

*See, e.g., Murray*, 365 F.3d at 1289-91; *McMahan,* 65 F.3d at 1050-51; *Victor*, 1992 WL 122911, at *6.

**B.    Bankers' Claim Against DLJ Under Section 2.03
Of The PSA Fails To Satisfy Federal Rule 8(a)(2)
<u>And Is Precluded By The Terms Of That Section</u>**

In Count IX of the Amended Complaint, Bankers alleges that DLJ breached its obligations under Section 2.03(c) of the PSA in connection with the underlying mortgage loans by failing to cure any breach with respect thereto or, where applicable, by providing substitute mortgage loans or repurchasing the mortgage loans.  Am. Compl. ¶¶ 109-113.  This claim also fails as a matter of law.

First, Bankers alleges no facts regarding the underlying mortgage loans or even the identity of those loans.  Such vague pleading fails to give DLJ fair notice and falls far short of demonstrating a "plausible entitlement to relief" under Federal Rule 8(a)(2).  *Bell Atl. Corp.*, 127 S. Ct. at 1967.  Indeed, it is not even possible based on such vague allegations to determine if DLJ was the entity that sold the allegedly offending mortgage loans since Washington Mutual Mortgage Securities Corp. also sold mortgage loans that were used in this transaction.  PSA, cover page; PSA, Article I, Definitions at 34 (defining "sellers" to include both DLJ and Washington Mutual Mortgage Securities Corp.).

The allegations also fail under the express terms of Section 2.03(c).  The plain language of that section makes clear it only applies to breaches that "materially and adversely" affect the interests of the Certificateholders in any mortgage loan and are "continuing."  The Amended Complaint contains no such allegations.  The claim also impermissibly seeks the remedy of damages.  However, Section 2.03(c) limits the remedy for a breach of that provision to specific performance:

> It is understood and agreed that the obligation under this Agreement of any Person to cure, repurchase or substitute any Mortgage Loan as to which a breach has occurred and is

> continuing <u>shall constitute the sole remedy against such Persons</u>
> <u>respecting such breach available to Certificateholders</u>, the
> Depositor or the Trustee on their behalf. (emphasis added).

Contractual limitations on remedies are enforced, and therefore Bankers is not entitled to the damages it seeks in any event. *See Mom's Bagels of N.Y., Inc. v. Sig Greenbaum, Inc.*, 164 A.D.2d 820, 822 (N.Y. App. Div. 1990).

C. **Bankers' Claims Against SPS Fail To Satisfy Federal**
   **Rule 8(a)(2) And Are Precluded By The Terms Of The PSA**

Bankers asserts three breach of contract claims against SPS based on various provisions of the PSA. As demonstrated below, each of those claims must be dismissed.

1. **Count XI – "Affirmative Actions"**

Bankers asserts that SPS breached Section 3.09 of the PSA by failing to pursue insurance claims on the mortgage loans. Am. Compl. ¶ 125, 126. This claim further alleges that SPS failed to satisfy its alleged obligation under Section 3.11 to foreclose on "delinquent" mortgage loans. Am. Compl. ¶ 125.

First, this claim must be dismissed for failure to provide adequate notice and demonstrate a plausible entitlement to relief under Federal Rule 8(a)(2). Bankers does not plead which mortgage loans are involved, thereby depriving SPS of meaningful notice of the claim. As with the claim against DLJ discussed above, without that information it is not even possible to know if SPS was the servicer at the time of the events in question – indeed, the initial servicers under the PSA were Washington Mutual and Vesta Servicing, L.P., <u>not</u> SPS. PSA, cover page; PSA, Article I, Definitions at 35 (defining "servicers" as Washington Mutual and Vesta Servicing, L.P.).

This claim also should be dismissed for failure to allege a breach under the plain terms of the relevant provisions. Section 3.09 provides in pertinent part:

> (d) In connection with its activities as servicer, each Servicer
> agrees to prepare and present, on behalf of itself, the Depositor, the

Trustee and the Certificateholders, claims to the insurer under any Primary Insurance Policy in a timely fashion in accordance with the terms of such Primary Insurance Policy and, in this regard, to take such reasonable action as shall be necessary to permit recovery under any Primary Insurance Policy respecting defaulted Mortgage Loans.  (emphasis added).

As set forth in Section 3.09(d), SPS's obligation to present insurance claims extends only to defaulted mortgage loans.  The Amended Complaint fails to plead any facts concerning the relevant mortgage loans – let alone that any such loans defaulted.  In addition, Bankers pleads no facts concerning how or in what manner SPS failed to fulfill its obligation under Section 3.09.

Similar pleading failures undermine the Section 3.11 branch of this claim. Section 3.11 states:

(a)      Each Servicer shall use reasonable efforts to foreclose upon or otherwise comparably convert the ownership of properties securing such of the related Mortgage Loans as come into and continue in default and as to which no satisfactory arrangements can be made for collection of delinquent payments.  In connection with such foreclosure or other conversion, each Servicer shall take such action as (i) such Servicer would take under similar circumstances with respect to a similar mortgage loan held for its own account for investment, (ii) shall be consistent with Accepted Servicing Practices, (iii) such Servicer shall determine consistently with Accepted Servicing Practices to be in the best interest of the Trustee and Certificateholders, and (iv) is consistent with the requirements of the insurer under any Required Insurance Policy; *provided, however,* that such Servicer shall not be required to expend its own funds in connection with any foreclosure or towards the restoration of any property unless it shall determine (i) that such restoration and/or foreclosure will increase the proceeds of liquidation of the related Mortgage Loan after reimbursement to itself of such expenses and (ii) that such expenses will be recoverable to it through Liquidation Proceeds (respecting which it shall have priority for purposes of withdrawals from the related Collection Account).  (emphasis added).

The plain language of the provision makes clear that SPS's obligation arises only where the subject loan comes into and continues in default, and satisfactory payment arrangements cannot be reached.  It also gives SPS discretion to determine whether pursuing foreclosure would

actually increase the liquidation proceeds on the subject loan after the expense of bringing the proceeding. The Amended Complaint contains no facts concerning how SPS supposedly failed to fulfill its obligations in light of these contractual provisions. These pleading failures are fatal under Federal Rule 8(a)(2).

### 2.　Count XII – "Reporting"

Bankers' reporting claim against SPS is equally lacking in merit. Bankers asserts that SPS breached Sections 2.07(m) and 3.07 of the PSA by failing to provide loan information to the Trustee. These sections provide:

> Section 2.07(m)
>
> [E]ach Servicer shall provide, <u>promptly upon request therefor</u>, any such additional loan-level information or data that the Trustee may from time to time reasonably request in order to enable the Trustee to perform its duties as set forth herein. (emphasis added).
>
> Section 3.07
>
> Each Servicer shall afford the Depositor and the Trustee reasonable access to all records and documentation regarding the Mortgage Loans and all accounts, insurance information and other matters relating to this Agreement, such access being afforded without charge, <u>but only upon reasonable written request</u> and during normal business hours at the office designated by such Servicer. (emphasis added).

As demonstrated by the express language of these provisions, SPS's obligation to provide information or reasonable access to records arises only upon request. The Amended Complaint does not allege that any such request was ever made or denied.

### 3.　Count XIII – "Enforcement Of Rights Against DLJ"

For its final contract claim against SPS, Bankers asserts that SPS failed to enforce DLJ's obligations following DLJ's alleged breach of Section 2.03 of the PSA. This claim fails for all the same reasons the claim against DLJ must be dismissed. *Supra*, at 20-21. Additionally, Bankers has not and cannot identify any provision of the PSA creating such an

enforcement obligation, and courts will not read new terms into a contract made between sophisticated parties. *See Vt. Teddy Bear Co., Inc. v. Madison Realty Co.*, 1 N.Y.3d 470, 475 (2004).

**D.**      **All Of Bankers' Contract Claims Are**
<u>**Barred Under Section 7.03 Of The PSA**</u>

In addition to all the reasons set forth above, the contract claims against DLJ and SPS are precluded by the exculpatory clause set forth in Section 7.03 of the PSA. Clauses such as Section 7.03 that clearly express an intention to limit liability are strictly construed and routinely enforced. *See Satterwhite v. Image Bank, Inc.*, No. 01-CV-7097, 2007 WL 2120429, at *1 (S.D.N.Y. July 20, 2007); *Uribe v. Merchs. Bank of N.Y.*, 91 N.Y.2d 336, 341 (1998); *Met. Life Ins. Co. v. Noble Lowndes Int'l, Inc.*, 84 N.Y.2d 430, 436 (1994). As demonstrated above, Bankers' contract claims are largely based on Bankers' disagreement with the judgment exercised by DLJ and SPS. Nowhere does the Amended Complaint allege that either DLJ or SPS breached the provisions of the PSA with willful misfeasance, bad faith, gross negligence or reckless disregard of their respective obligations. Accordingly, Bankers' claims against DLJ and SPS fall within the ambit of Section 7.03 and also must be dismissed on that basis.

## CONCLUSION

For the foregoing reasons, the Credit Suisse Defendants respectfully request that the Court dismiss Bankers' Amended Complaint with prejudice, and for such other and further relief as this Court deems just and proper.


Dated: New York, New York              Respectfully submitted,
       September 28, 2007

                                      s/John F. Mariani
                                      John F. Mariani
       Florida Bar Number: 263524
       GUNSTER, YOAKLEY & STEWART, P.A.
       Phillips Point - Suite 500 East
       777 South Flagler Drive
       West Palm Beach, FL  33401-6194
       Telephone: (561) 655-1980
       Facsimile:  (561) 655-5677
       jmariani@gunster.com

       Jeffrey Q. Smith (admitted *pro hac vice*)
       Scott E. Eckas (admitted *pro hac vice*)
       Colleen J. O'Loughlin (admitted *pro hac vice*)
       MCKEE NELSON LLP
       One Battery Park Plaza
       New York, New York   10004
       Telephone: (917) 777-4200
       Facsimile: (917) 777-4299
       seckas@mckeenelson.com

       Counsel for Defendants Credit Suisse
       Securities (USA) LLC, Credit Suisse First
       Boston Mortgage Securities Corp., DLJ
       Mortgage Capital, Inc., and Select Portfolio
       Servicing, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 28, 2007, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.


<u>s/John F. Mariani</u>
John F. Mariani

## <u>SERVICE LIST</u>
**Bankers Life Insurance Company v. Credit Suisse First Boston Corporation, et al.**
**Case No. 8:07-cv-00690-EAK-MSS**
**United States District Court, Middle District of Florida**

**Electronic Mail Notice List**

**Thomas J. Cunningham**
tcunningham@lordbissell.com, docket@lordbissell.com, eching@lordbissell.com

**John P. Doherty**
jdoherty@tpw.com

**Christopher Edward Doran**
cdoran@mmhlaw.com, tdavis@mmhlaw.com

**Scott E. Eckas**
seckas@mckeenelson.com

**Simon A. Fleischmann**
sfleischmann@lordbissell.com, docket@lordbissell.com, kargyris@lordbissell.com

**Richard F. Hans**
rhans@tpw.com, mmuller@tpw.com

**Adam J. Hodkin**
hodkin@thkolaw.com

**Andrew Dale Ledbetter**
dledbetter@dlsecuritieslaw.com

**John F. Mariani**
jmariani@gunster.com, lmiller@gunster.com

**John M. Murray**
jmurray@mmhlaw.com, tdavis@mmhlaw.com, dperacchi@mmhlaw.com,
vgannuscio@mmhlaw.com

**Thomas O. O'Connor**
toconnor@tpw.com

**Colleen J. O'Loughlin**
coloughlin@mckeenelson.com

**Jeffrey Q. Smith**
jqsmith@mckeenelson.com

**Edmund S. Whitson, III**
edmund.whitson@akerman.com