## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

BANKERS LIFE INSURANCE COMPANY,

      Plaintiff,

      Case No. 8:07-CV-00690-EAK-MSS

vs.

      **ORAL ARGUMENT REQUESTED**

CREDIT SUISSE FIRST BOSTON
CORPORATION, also known as Credit Suisse
Securities (USA) LLC, *et al.*,

      Defendants.

_____/

## MOTION OF CREDIT SUISSE SECURITIES (USA) LLC, CREDIT SUISSE FIRST BOSTON MORTGAGE SECURITIES CORP., DLJ MORTGAGE CAPITAL, INC. AND SELECT PORTFOLIO SERVICING, INC. TO DISMISS THE SECOND AMENDED COMPLAINT AND INCORPORATED MEMORANDUM OF LAW

      The Credit Suisse Defendants respectfully submit this memorandum of law in support of their motion to dismiss the Second Amended Complaint filed by plaintiff Bankers Life Insurance Company ("Bankers"). The Credit Suisse Defendants are: Credit Suisse Securities (USA) LLC, formerly known as Credit Suisse First Boston Corporation ("Credit Suisse"), Credit Suisse First Boston Mortgage Securities Corp. ("Credit Suisse Mortgage"), DLJ Mortgage Capital, Inc. ("DLJ") and Select Portfolio Servicing, Inc. ("SPS"). Bankers filed the Second Amended Complaint pursuant to leave granted by this Court in its Order on Motions to Dismiss, dated April 22, 2008 (the "Order"), which dismissed Bankers' claims for fraud and civil conspiracy. Order at 20.

      The Second Amended Complaint's new allegations with respect to the common law fraud (Counts III and VII) and civil conspiracy (Count XVII) claims are deficient as a matter of law, and those claims should be dismissed for the multiple, independently sufficient reasons

demonstrated below.  Bankers' new fraud allegations are contained in six paragraphs of its Second Amended Complaint and essentially allege that:

- The underwriting standards on the mortgage loans were impermissibly lowered by unnamed mortgage originators (who are not Credit Suisse entities or parties to this case) and Credit Suisse and Credit Suisse Mortgage knew or should have known this and insisted on higher standards.  SAC ¶¶ 53-54, 82.

- Credit Suisse and Credit Suisse Mortgage should have disclosed that these same mortgage originators would not be able to meet their repurchase and cure obligations with respect to certain mortgage loans that might be found to be defective.  SAC ¶¶ 56, 83.  However, under the applicable documents, the mortgage originators have no obligation to the Trust and, even if there were such obligations, by definition they could not arise until after the issuance of the Prospectus and Supplemental Prospectus.

- Credit Suisse and Credit Suisse Securities should have disclosed the number of insurance claims filed and the number denied by the insurer.  SAC ¶¶ 55, 82. However, by definition, no payment on any insurance claims would be due until after the issuance of the Prospectus and Supplemental Prospectus and therefore this allegation presupposes a duty to update those documents over the life of the transaction.

These new fraud allegations do not allege actionable misstatements or omissions, and still fail to comply with Federal Rule 9(b) and to properly plead scienter, reasonable reliance and proximate cause.  *See* Argument Point I at 13-23.  In addition, Bankers' new civil conspiracy allegations (SAC ¶¶ 156-161) do not resolve the fundamental deficiencies that Bankers has not pled an agreement among the supposed conspirators or an actionable underlying tort.  *See* Argument Point II at 23.  Finally, Bankers' allegations in the Second Amended Complaint with respect to

its negligent misrepresentation (Counts I and V), breach of fiduciary duty (Counts IV and X) and breach of contract claims (Counts IX, XI-XII) are nearly identical to the allegations in Bankers' Amended Complaint and should be dismissed for the same reasons set forth in the Credit Suisse Defendants' Memorandum of Law in support of their Motion for Reconsideration *sub judice*. *See* Argument Point III at 24.

## PROCEDURAL HISTORY

Bankers commenced this action on April 23, 2007, asserting claims against the Credit Suisse Defendants for violations of federal and Florida securities laws, common law fraud, negligent misrepresentation, breach of fiduciary duty and civil conspiracy.  On June 22, 2007, the Credit Suisse Defendants moved to dismiss the Complaint in its entirety.  Rather than defend its allegations against the motion to dismiss, Bankers requested an extension of time to file and serve an amended complaint.

On August 27, 2007, Bankers filed and served its Amended Complaint and abandoned wholesale all of its federal and state securities law claims, repled its common law claims and asserted new claims for breach of contract.  The Credit Suisse Defendants moved to dismiss the Amended Complaint on September 28, 2007, Bankers opposed that motion on November 1, 2007, and the Credit Suisse Defendants replied with leave of Court on December 3, 2007.

Thereafter, on April 22, 2008, this Court entered the Order granting in part and denying in part the Credit Suisse Defendants' motion to dismiss.  The Court denied the Credit Suisse Defendants' motion to dismiss Bankers' breach of contract, negligent misrepresentation and breach of fiduciary duty claims.  On May 6, 2008, the Credit Suisse Defendants moved for reconsideration of the Order with respect to those claims (the "Reconsideration Brief").

The Court granted the Credit Suisse Defendants' motion with respect to Bankers' common law fraud and civil conspiracy claims.  With respect to Bankers' common law fraud

claim, the Court concluded that the Amended Complaint failed to adequately plead scienter. Order at 9-10. In particular, the Court reasoned that Bankers "failed to provide factual support explaining *why* Credit Suisse knew or should have known of the misrepresentations' falsity." Order at 9. (emphasis in original). This Court further held that the Amended Complaint "undoubtedly failed to meet" Rule 9(b)'s requirement that "fraud claims be pled with a heightened level of particularity." *Id*. Because it dismissed Bankers' fraud claims based on the above grounds, the Court did not reach the additional, independently sufficient reasons to dismiss Bankers' claims.

Regarding Bankers' claim for civil conspiracy, the Court concluded that "[r]egardless of whether Plaintiff has sufficiently pled . . . overt acts . . . Plaintiff has failed to plead facts in support of any form of conspiracy." Order at 19. The Court dismissed this claim because Bankers' "conclusory statements" failed to satisfy Rule 8(a)(2). *Id*.

The Court granted Bankers leave to replead and, on May 6, 2008, Bankers filed the Second Amended Complaint, attempting to cure these deficiencies with six paragraphs of new allegations in support of its fraud claims and eight paragraphs of new allegations in support of its civil conspiracy claims. SAC ¶¶ 53-56, 82-83, 156-61.

## BACKGROUND AND RELEVANT FACTS

### A.    Structure of the Transaction and Overview Of The Dispute

This case involves CSFB Mortgage-Backed Pass-Through Certificates, Series 2001-28 (the "Certificates"), which were issued in connection with a residential mortgage structured finance transaction. First, DLJ and Washington Mutual Mortgage Securities Corp. (a nonparty to this action and together with DLJ, the "Sellers") acquired from various mortgage originators a pool of residential mortgage loans with an aggregate principal balance of approximately $300 million. S. Pr. at S-17.[1] The Sellers then transferred those mortgage loans

---

[1]    The October 23, 2001 Prospectus ("Pr."), the November 29, 2001 Supplemental Prospectus ("S. Pr."), the November 1, 2001 Pooling and Servicing Agreement ("PSA") and the Trustee's December 26,

to Credit Suisse Mortgage, who then conveyed the mortgage loans to the Trust and received in return the Certificates evidencing various interests in the Trust pursuant to the November 1, 2001 Pooling and Servicing Agreement.  PSA § 2:01, S. Pr. at S-17, S-39.  The Certificates were then sold by Credit Suisse during an initial marketing period to sophisticated investors.  S. Pr. at S-1.

        The Certificateholders have certain rights to distributions of amounts collected on the mortgage loans by the Trust.  S. Pr. at S-6-8, S-39-67.  The interests in the Trust are divided into multiple classes (often called "tranches").  S. Pr. at S-6.  Each tranche has a unique position in the Trust's hierarchy of payments (*i.e.*, who gets paid first, second, etc.), which is known as the "waterfall."  S. Pr. at S-6-8, S-39-67.  The tranches that are entitled to receive distributions first generally bear less risk than the tranches lower down the waterfall.  S. Pr. at S-6-16, S-39-67.  This transaction has 11 tranches of offered Certificates.  S. Pr. at S-6.  The rights attendant to each of the tranches are set forth in detail in the Supplemental Prospectus.  S. Pr. at S-39-67.  As detailed below, the Certificates held by Bankers are among the most subordinated in the transaction.  Especially for this sort of investor, the degree to which the Certificates turn out to be a successful investment depends on how well the underlying pool of mortgage loans performs, which, in turn, is directly related to the general state of the United States housing market.

        It is common in these structured finance transactions to have the various tranches of certificates "rated" by one or more of the larger independent rating agencies such as Moody's Investors Service ("Moody's"), Standard & Poor's or Fitch Ratings.  The subordinated tranches of Certificates in this transaction were rated by Moody's.  S. Pr. at S-6, S-72-73.  Both the Prospectus and the Supplemental Prospectus fully disclose that the ratings given to the various

---

2001 Statement to Certificateholders ("Tr. Stmt.") are attached to the Second Amended Complaint as Exhibits A, B, C and D, respectively.  Accordingly, the Court may consider these documents on this motion to dismiss.  *See, e.g., Frenck v. Corr. Corp. of Am.*, No. 06-CV-1534, 2006 WL 3147656, at *2 (M.D. Fla. Nov. 1, 2006).

tranches of Certificates are in the sole judgment of the rating agencies, not the Credit Suisse Defendants, and may change from time to time.  Pr. at 102; S. Pr. at S-9, S-72-73.

In January and February 2004 (more than two years after the Certificates were issued), Bankers purchased approximately $1.4 million of subordinated Class I-B-2 and I-B-3 Certificates in the secondary market (the "Subordinated Certificates") from unidentified third parties.  SAC ¶ 28.  The Second Amended Complaint does not allege that Bankers had any contact whatsoever with any of the Credit Suisse Defendants in connection with making or carrying out its investment decision.  As disclosed in the Supplemental Prospectus, <u>Class I-B-2 and I-B-3 Certificates were subordinate to approximately 99 percent of all the Certificates offered publicly for sale in the initial distribution and, thus, were among the riskiest Certificates offered</u>.  S. Pr. at S-1, S-6, S-67.  The subordinated Certificates purchased by Bankers have both a higher level of risk and a higher level of potential return.  S. Pr. at S-6, S-15, S-52, S-67.  Indeed, at the time of the offering, the subordinated Certificates purchased by Bankers had a <u>rate of return two-and-a-half times higher</u> than the least risky Certificates.  S. Pr. at S-6.

According to the Second Amended Complaint, approximately one year after Bankers purchased the Certificates, they began to decline in value.  SAC ¶ 32 & n.6.  <u>That decline, however, is entirely consistent with the risk disclosures made in the offering documents</u>.  Those documents clearly state that a decline in the real estate market will adversely affect the value of the Certificates.  S. Pr. at S-10-12.  They also state that the ratings of the Certificates may be lowered by the rating agencies in their independent judgment if the performance of the mortgage loans is less than expected and that such an action would negatively impact the value of the Certificates.  Pr. at 102; S. Pr. at S-9, S-72-73.

**B.      Disclosures in the Supplemental Prospectus**
**Relevant to the Second Amended Complaint**

In connection with the transaction, Credit Suisse prepared a Prospectus and Supplemental Prospectus were prepared that contained information regarding the characteristics

of the Certificates and set forth the potential risks involved in making an investment. The Prospectus and Supplemental Prospectus were prepared to distribute to investors during the initial marketing period. Under applicable federal securities laws, Credit Suisse was only obligated to deliver the Prospectus and Supplemental Prospectus for a period of 90 days after the date of the Supplemental Prospectus. 15 U.S.C. § 77d (providing prospectus delivery requirements); *Saslaw v. Askari*, No. 95-CV-7641, 1997 WL 221208, at *6 (S.D.N.Y. Apr. 25, 1997) (prospectus delivery requirements do not extend to secondary market purchasers). Set forth below are the most significant disclosures relating to the claims made in the Second Amended Complaint.

***Post-Closing Responsibilities***. The mortgage pool has "servicers" who, among other things, are responsible for various administrative activities relating to the underlying mortgage loans, including <u>after</u> the closing of the transaction.[2] The obligations of the servicers are set forth in the PSA, and information regarding them and their role is fully disclosed in the Supplemental Prospectus. PSA Article III; S. Pr. at S-33-39.

The Trustee is the entity generally responsible for, among other things, distributing payments to, and administering to the interests of, the Certificateholders <u>after</u> the closing of the transaction. PSA §§ 2.01-02, 9.01-02. The specific rights and duties of the Trustee in administering the Trust are set forth in the PSA and fully disclosed in the Supplemental Prospectus. PSA §§ 9.01-14; S. Pr. at S-17, S-32-33, S-55. Included among these duties is the Trustee's obligation to make certain information that it receives concerning the Certificates and the underlying mortgage loans available to Certificateholders on a monthly basis in a Statement to Certificateholders ("Trustee Statement"), a sample of which is attached to the

---

[2]    The original servicers for the mortgage loans were Vesta Servicing, L.P. and Washington Mutual. S. Pr. at S-33-34. Defendant SPS assumed the role of servicer from these two companies in or about December, 2002.

Second Amended Complaint. PSA § 4.04(a); S. Pr. at S-55; Tr. Stmt. These Statements were also made available to Moody's. PSA § 4.04(a).

The Sellers are the entities responsible for buying back or curing any defective loans. PSA § 2.03; S. Pr. at S-17-18. Although the Sellers may have a claim against the mortgage originators based on these defective loans, the Sellers's contractual repurchase and cure obligations to the Trust are not dependent on its right to recover against third parties. PSA § 2.03.

***The Trustee Statements***. As disclosed in the Supplemental Prospectus, the Trustee Statements were the "primary source" of information available to secondary market purchasers like Bankers. The Supplemental Prospectus provides:

> There can be no assurance that a secondary market for the offered certificates will develop or, if it does develop, that it will continue or will provide investors with a sufficient level of liquidity. The primary source of information available to investors concerning the offered certificates will be monthly statements . . . which will include information as to the outstanding principal balance of the offered certificates and the status of the applicable form of credit enhancement. There can be no assurance that any additional information regarding the offered certificates will be available through any other source. S. Pr. at S-72 (emphasis added).

The Trustee Statements are made available on the Trustee's internet website. S. Pr. at S-55, S-72. Presently, the Trustee's website is located at https://sfr.bankofny.com/SFR/Login.jsp.[3] This website provides current and historical financial data regarding the transaction and is accessible to any viewer who registers with the site, whether or not that viewer actually owns any Certificates. *Id*. If reviewed, a secondary market investor like Bankers would know the monthly principal and

---

[3]       Courts may take judicial notice of the Trustee's website because the fact that the Trustee maintains a website and the information available on it are not subject to reasonable dispute and are capable of accurate and ready determination. Fed. R. Evid. 201(b); *see, e.g., In re Everglades Island Boat Tours, LLC*, 484 F. Supp. 2d 1259, 1261 (M.D. Fla. 2007); *Frenck*, 2006 WL 3147656, at *2 ("While courts must liberally construe and accept as true allegations of fact in the complaint . . . they need not accept facts which run counter to facts of which the court can take judicial notice.").

interest distributions on each tranche of the Certificates and have the most recent data concerning the underlying mortgage loans, including delinquency information.  Tr. Stmt.

*__General Risks of Investing in the Residential Real Estate Market and Special Risks for Holders of Subordinated Certificates__.*  The Prospectus and the Supplemental Prospectus fully identify the risk factors attendant to investing in the Subordinated Certificates, including, among other things, that returns will depend on how many of the mortgage loans prepay (and therefore are no longer in the pool), and on how many of the mortgage loans default and the recovery rate on such defaults.  S. Pr. at S-10-16.

Under the heading "Risk Factors," the Supplemental Prospectus specifically sets forth:

> **The return on your certificates may be affected by losses on the mortgage loans, which could occur for a variety of reasons.**
>
> Losses on the mortgage loans may occur due to a wide variety of causes, including a decline in real estate values, and adverse changes in the borrower's financial condition.  A decline in real estate values or economic conditions nationally or in the regions where the mortgaged properties are concentrated may increase the risk of losses on the mortgage loans.  S. Pr. at S-10 (emphasis in original).
>
> **The value of your certificate may be reduced if losses are higher than expected[.]**
>
> If the performance of the mortgage loans is substantially worse than assumed by the rating agencies, the ratings of any class of related certificates may be lowered in the future.  This would probably reduce the value of those certificates.  S. Pr. at S-11 (emphasis in original).

The Supplemental Prospectus also specifically discusses the heightened risk for holders of the Subordinated Certificates.  S. Pr. at S-15, S-52, S-67.  The holders of the Subordinated Certificates, including Bankers, were compensated for this risk with a significantly higher rate of return.  The Subordinated Certificates purchased by Bankers paid interest at the fixed rate of 7.75%.  S. Pr. at S-6.  The least risky Certificates generated interest at a rate of only

2.76% at the time of issuance.  *Id*.  Thus, the rate of return on the Subordinated Certificates was <u>two-and-a-half times</u> that of the least risky Certificates at the time of issuance.[4]

   ***The Mortgage Loans in the Pool***.  The underlying pool of mortgage loans is the primary asset of the Trust.  Pr. at 1; S. Pr. at S-5, S-17.  The Supplemental Prospectus discloses detailed, numerical data on these mortgage loans regarding, among other things, the interest rates, the types of properties securing the loans, the purpose for which the loans were made, the original loan-to-value ratio, how much time had passed since origination of the loans, where the mortgaged properties were located, the distribution of credit scores of the borrowers, and the amount and nature of the documentation required from the borrowers.  S. Pr. at S-24-30.  For example, with respect to the Group I loans, 80% were refinancings, 49% were concentrated in only six states and 93% were based on credit scores of 720 or lower – below the present national average of 723.   S. Pr. at S-24-26;  *see also*  FICO Home Page, http://www.myfico.com. Regarding the Group II loans, 38% were concentrated in one state, 28% were based on no documentation and 79% were based on credit scores of 720 or lower.  S. Pr. at S-27-29.  For the adjustable mortgage loans (which were less than 12% of the pool), the Supplemental Prospectus sets forth additional detailed information regarding the interest rate, including the frequency of rate adjustments, the maximum rates, and the existence of any rate caps or rate floors.  S. Pr. at S-18-19.

   In addition to specifically disclosing data on all of the loans (which makes the underwriting criteria apparent), <u>the Supplemental Prospectus also expressly warned investors of</u>

---

4  After the first payment, the least risky Certificates were paid interest at a floating rate of 0.65% over the rates for one-month LIBOR for dollar deposits.  S.Pr. at S-6, S-50.  On November 30, 2001, the one-month LIBOR for dollar deposits was 2.11875%.   *Money Rates*, Wall St. J., Dec. 3, 2001.   Courts may take judicial notice of "facts that are not subject to dispute because they are capable of accurate and ready determination."   Fed. R. Evid. 201(b);  *see, e.g., City of Fort Lauderdale v. Town of Hacienda Village, Inc.*, 172 So. 2d 451, 452-53 (Fla. 1965).

the risk that the underlying mortgage loans were originated based on less stringent underwriting criteria than may be required by other purchasers of mortgage loans:

> The underwriting standards typically differ from, and are generally less stringent than, the underwriting standards established by Fannie Mae or Freddie Mac. In addition, the mortgage loans may have been made to mortgagors with imperfect credit histories, ranging from minor delinquencies to bankruptcy, or mortgagors with relatively high ratios of monthly mortgage payments to income or relatively high ratios of total monthly credit payments to income. Consequently, the mortgage loans may experience rates of delinquency, foreclosure and bankruptcy that are higher, and that may be substantially higher, than those experienced by mortgage loans underwritten in accordance with higher standards. S. Pr. at S-10.

The Supplemental Prospectus also states:

> Certain of the mortgage loans have been originated under alternative documentation, reduced documentation, no stated income, no documentation, stated income/stated asset or no ratio programs which require less documentation and verification than do traditional full documentation programs. . . . Under a no documentation or stated income/stated asset program, no verification of a mortgagor's income or assets is undertaken by the originator. The underwriting for such mortgage loans may be based primarily or entirely on an appraisal of the mortgaged property and the LTV at origination. S. Pr. at S-31.

Finally, the Supplemental Prospectus provides that a "substantial portion of the mortgage loans were classified in . . . relatively higher risk . . . credit categories." S. Pr. at S-32.

*__Insurance on the Mortgage Loans__*. In connection with this transaction, Triad Guaranty Insurance Corporation ("TGIC") issued a mortgage guaranty insurance policy ("TGIC Policy") that insured certain of the mortgage loans for certain types of losses, up to a set maximum amount. The details of that insurance coverage are set out in the TGIC Policy attached to the Second Amended Complaint and fully disclosed in the Supplemental Prospectus. S. Pr. at S-19-21. Significantly, the TGIC Policy only covers future claims made after the effective date of the Policy. TGIC Policy at III.B. As disclosed in the Supplemental Prospectus, the TGIC Policy specifically excludes, among other items, "any claim resulting from a default

existing at the inception of coverage." S. Pr. at S-21. Thus, by its terms, the TGIC Policy only covered claims arising in the future. The language of the PSA also demonstrates the forward-looking aspect of this obligation. Section 3.09(c) of the PSA provides that "each Servicer agrees to prepare and present . . . claims to the insurer under any Primary Insurance Policy in a timely fashion . . . and, in this regard, to take such reasonable action as shall be necessary to permit recovery . . . respecting defaulted Mortgage Loans." PSA § 3.09(c).

   *__Buyback and Cure Obligations__*. The PSA also contemplates certain protections with respect to the underlying mortgage loans for the life of the transaction. PSA § 2.03(b). These future protections were also disclosed in the Supplemental Prospectus. S. Pr. at S-17-18. Specifically, in delivering the mortgage loans to Credit Suisse Mortgage, the Sellers provided certain representations and warranties concerning the integrity of that collateral. PSA, Schedule III. In the event of any future breach of those representations, the PSA provides that within the earlier of either 90 days from their own discovery or on receipt of notice, the Sellers must: (i) cure the breach; (ii) remove the nonconforming loan and substitute another (if within two years of the Closing Date); or (iii) repurchase the nonconforming loan. PSA § 2.03(b). As demonstrated by the express terms of Section 2.03(b), these cure, substitution and repurchase remedies involved the future obligations of the Sellers should a triggering event occur.

## ARGUMENT

   In *Bell Atlantic Corp. v. Twombly*, the Supreme Court held that a complaint must satisfy the following requirements under Rule 8(a)(2) to survive a motion to dismiss:

> a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact).

127 S. Ct. 1955, 1964-65 (2007) (citations omitted); *Trent v. Mortgage Elec. Registration Sys., Inc.*, No. 06-CV-374, 2007 WL 2120262, at *2 (M.D. Fla. July 20, 2007). Thus, a motion to

dismiss should be granted where the factual allegations do not "plausibly suggest[]" entitlement to relief. 127 S. Ct. at 1966. Moreover, in complex cases, "a fuller set of factual allegations . . . may be necessary to show that the plaintiff's claim is not largely groundless." *Limestone Dev. Corp. v. Vill. of Lemont, Ill.*, 520 F.3d 797, 803-04 (7th Cir. 2008) (internal quotation and citation omitted). Dismissal is also warranted where the factual allegations pled undermine the claims asserted. *See Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1205-06 (11th Cir. 2007).

## I.    BANKERS STILL FAILS TO STATE A CLAIM FOR COMMON LAW FRAUD

In an attempt to cure the defects in its prior pleading, Bankers adds six new paragraphs to the Second Amended Complaint that allege three new factual predicates supposedly supporting its fraud claims: (i) a lowering of underwriting standards (SAC ¶¶ 53-54, 82); (ii) Triad's handling of insurance claims <u>after</u> the date of the Prospectus and Supplemental Prospectus (SAC ¶¶ 55, 82); and (iii) statements in the Supplemental Prospectus regarding the obligation of the mortgage originators (who are not Credit Suisse entities or parties to this dispute) to repurchase or otherwise cure certain deficient mortgage loans <u>after</u> the date of the Prospectus and Supplemental Prospectus. SAC ¶¶ 56, 83. Bankers also continues to rely on its allegations regarding a statement in the Supplemental Prospectus regarding delinquent loans. SAC ¶ 20.

### A.    Bankers Alleges No Legally Cognizable Misstatement or Omission with Respect to Three of its Four Factual Predicates, Fails to Meet the Requirements of Rule 9(b), and Fails to Properly Plead Scienter or Materiality

Black-letter law (as well as common sense) recognizes that a fraud claim cannot exist without a legally cognizable misstatement or omission. *Mergens v. Dreyfoos*, 166 F.3d 1114, 1117-19 (11th Cir. 1999); *Cement & Concrete Workers Dist. Council Welfare Fund v. Lollo*, 148 F.3d 194, 196 (2d Cir. 1998) As demonstrated below, this test is not met by Bankers' allegations regarding the lowering of underwriting standards, Triad's handling of insurance

claims, and the obligation of the originators to repurchase or otherwise cure certain deficient loans.

The Second Amended Complaint also fails to comply with Rule 9(b), which "requires that fraud claims be pled with a heightened level of particularity." Order at 9. To satisfy this requirement in the Eleventh Circuit, Bankers must allege not only who, what, when and where, but also "how" it was mislead. *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006); *Trenton Int'l, Ltd. v. Trenton Int'l, Inc.*, No. 05-CV-581, 2006 WL 3201869, at *1 (M.D. Fla. Nov. 6, 2006). Bankers has not done so with respect to any of the factual predicates underlying its fraud claims. Likewise, Bankers has failed to properly plead scienter with respect to any of its factual predicates. As this Court has recognized, Bankers must plead facts explaining "*why*" Credit Suisse and Credit Suisse Mortgage knew or should have known that the alleged misstatement and omissions were false. Order at 9 (emphasis in original). Bankers has not done so. Finally, Bankers has failed to plead materiality.

## 1. <u>Alleged Lowering of Underwriting Standards</u>

Bankers alleges that the mortgage loan originators – whom Bankers has not sued in this case or even identified – lowered their underwriting criteria and that Credit Suisse should have insisted on higher standards. SAC ¶¶ 53-54, 82. The Second Amended Complaint, however, fails to allege any misstatement made by Credit Suisse in this regard, point to any statements made misleading due to an omission, or contend that anything additional should have been disclosed. A fraud claim cannot be based on Bankers' retrospective view that Credit Suisse made a mistake in business judgment regarding the appropriate underwriting standards – rather, it must be based on a misstatement or omission with respect to the underwriting standards used. *Mergens*, 166 F.3d at 1117-19; *Lollo*, 148 F.3d at 196. Bankers has not only failed to allege any legally cognizable misstatement or omission, it has failed to allege <u>any</u> misstatement or omission at all.

14

The Supplemental Prospectus – which Bankers alleges it relied on – provides detailed information regarding the underwriting criteria for the mortgage loans and Bankers does not challenge that disclosure.  Among other things, for every mortgage loan in the pool, the Supplemental Prospectus sets forth: (i) the loan-to-value ratios; (ii) interest rate information; (iii) the months since origination; (iv) remaining terms of the loans; (v) the documentation programs of the loans; (vi) the credit scores of the borrowers; (vii) the types of mortgaged properties, occupancy and purpose of the loans; and (vii) the geographic distribution of the loans.  S. Pr. at S-24-30.  Bankers takes issue with none of this information.

As set forth above, in addition to specifically disclosing the underwriting criteria, the Supplemental Prospectus also expressly warned investors of the risk from the underlying mortgage loans being originated based on less stringent underwriting criteria than may be required by other purchasers of mortgage loans. S. Pr. at S-10, S-31-32.  The Supplemental Prospectus also stated that certain of the mortgage loans were originated under alternative and reduced documentation programs that require less verification than do traditional full documentation programs.  S. Pr. at S-31.  Finally, the Supplemental Prospectus provides that a "substantial portion of the mortgage loans were classified in . . . relatively higher risk . . . credit categories."  S. Pr. at S-32.

Quite apart from there being no actual alleged misrepresentation or omission, Bankers' allegations regarding the change in underwriting standards wholly fail to comply with Rule 9(b).  Bankers does not allege who the mortgage brokers were, when the mortgage underwriting standards were impermissibly lowered, in what way they were lowered, or how Bankers possibly could have been deceived given the disclosures in the Supplemental Prospectus.  To the extent the Second Amended Complaint can be read to allege that the underwriting standards used were different than those set forth in the Prospectus and Supplemental Prospectus (although the pleading does not actually say that), Bankers has not (and

15

cannot) properly plead scienter by alleging <u>why</u> Credit Suisse and Credit Suisse Mortgage should have known of the "recklessly lowered criteria and standards."

### 2. The Alleged Misrepresentation Regarding the Originators' Repurchase/Cure Obligations

The Second Amended Complaint alleges that Credit Suisse and Credit Suisse Mortgage knew or should have known that the loan originators would not (or could not) repurchase or otherwise cure any defective loans in the mortgage pool.  SAC ¶¶ 56, 83.  Therefore, Bankers contends, any statement in the Prospectus or Supplemental Prospectus regarding the loan originators' repurchase and cure obligations was false.  *Id*.  Those allegations are insufficient to support a claim for fraud.

By definition, the mortgage originators' obligation to repurchase or cure any deficient mortgage loans could only occur <u>after</u> the closing of the Transaction – which means only <u>after</u> the Prospectus and Supplemental Prospectus were issued – and therefore the mortgage originators could not have failed to fulfill their obligations at the time Credit Suisse made its disclosure.  It is well-established under both Florida and New York law, that a fraud claim requires a misrepresentation or omission of an <u>existing</u> material fact.[5]  *Lollo*, 148 F.3d at 196; *Kramer v. Unitas*, 831 F.2d 994, 998 (11th Cir. 1987).

Statements regarding expected future conduct – such as the expected future conduct of the mortgage originators based on their contractual obligations – are insufficient to support a claim for common law fraud unless the plaintiff can demonstrate knowledge that such conduct would not occur at the time the alleged statement was made.  *Thompkins v. Lil' Joe*

---

[5]    It is unnecessary for this Court to engage in a conflict of laws analysis unless there is a material, outcome determinative conflict between the laws of the interested states.  *Fioretti v. Mass. Gen. Life Ins. Co.*, 53 F.3d 1228, 1234 (11th Cir. 1995).  Bankers' fraud and civil conspiracy claims should be dismissed as a matter of law regardless of whether Florida or New York law is applied.  Nevertheless, if this Court determines that a choice of law analysis is necessary, New York law should be applied to Bankers' fraud and civil conspiracy claims because it is the state with the most significant relationship to the relevant events.  *See* Restatement (Second) of Conflict of Laws § 148 (1971); *Trumpet Vine Invs., N.V. v. Union Capital Partners I, Inc.*, 92 F.3d 1110, 1115-16 (11th Cir. 1996).

*Records, Inc.*, 476 F.3d 1294, 1316 (11th Cir.), *cert. denied*, 128 S. Ct. 613 (2007); *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994); *Henneberry v. Sumitomo Corp. of Am.*, 532 F. Supp. 2d 523, 545 (S.D.N.Y. 2007).  Bankers has alleged no facts that would establish such knowledge.  This failing also means that Bankers has failed to properly plead scienter.  In addition, the requirements of Rule 9(b) are not met since Bankers nowhere pleads <u>who</u> the mortgage originators were, <u>when</u> Credit Suisse and Credit Suisse Mortgage knew or should have known of the false statement, and <u>what</u> mortgages should have been repurchased or otherwise cured and were not.[6]

### 3.    The Alleged Insurance Omission or Misrepresentation

Bankers claims that Credit Suisse and Credit Suisse Mortgage knew or should have known that 190 insurance claims were made to TGIC, and that TGIC denied approximately 51 of those claims.  SAC ¶¶ 55, 82.  The Second Amended Complaint contends that Credit Suisse and Credit Suisse Mortgage should have disclosed this information to investors and that Credit Suisse should have also disclosed the same to Moody's.  *Id.*

First, as with the repurchase and cure obligations of the originators, the payment on insurance claims (or the denial thereof) would only occur <u>after</u> the closing of the Transaction – which means only <u>after</u> the Prospectus and Supplemental Prospectus were issued.[7]  Thus, <u>this</u>

---

[6]    Although Bankers attempts to suggest otherwise, the contractual obligation owed to the Trust to repurchase or cure defective mortgages is an <u>obligation of the Sellers</u> that is not in anyway dependent on actions the loan originators do or do not take.  PSA § 2.03.  Even if Bankers had attempted to support its fraud claim by alleging that the Sellers failed in their repurchase or cure obligations (which it has not), it cannot be disputed that those obligations concern specific rights and duties governed by the PSA.  PSA § 2.03; SAC ¶ 23.  Both New York and Florida law recognize that statements regarding the future intent to perform a contract are actionable only as breach of contact claims and do not give rise to an independent claim for fraud.  *Thompkins*, 476 F.3d at 1316; *Hallinan v. Republic Bank & Trust Co.*, No. 06-CV-185, 2007 WL 39302, at *11-13 (S.D.N.Y. Jan. 8, 2008).  Indeed, Bankers has asserted a breach of contract claims concerning these obligations against DLJ and SPS in Counts IX and XIII of the Second Amended Complaint.  SAC ¶¶ 97-102, 123-29.

[7]    The earliest a claim could be submitted would be as of the "Effective Date," which is defined under the TGIC Policy as October 30, 2001, provided that the initial premium had been paid.  TGIC Policy at J.2.  The initial premium, however, was not due until 15 days after the Effective Date, and the

alleged omission is only cognizable if Credit Suisse had a duty to continually monitor insurance issues and repeatedly update the Prospectus and Supplemental Prospectus. But no such duty exists under either Florida or New York law. To accept Bankers' position is to impose on an underwriter for the entire life of a security the duty to constantly analyze the performance of that security and to provide written commentary regarding that performance to the investing public – in essence, turning an underwriter into an uncompensated financial analyst for decades to come. This position is fundamentally at odds with accepted law regarding the role and duties of an underwriter – particularly where, as here, that role is assigned under the PSA to the servicer and the Trustee (who are compensated for performing it), and the transaction in question will last for 30 years. S. Pr. at S-67.

In any event, a duty to update arises only in the context of federal securities claims, which are not alleged here. And, even if such a duty existed – which it did not – the timeframe to update or "sticker" a prospectus expires at the time of the closing of the offering or at the conclusion of the initial distribution period, and does not extend into perpetuity as Bankers suggests. *See, e.g., SEC. v. N. Atl. Airlines, Inc.*, No. 86-CV-442, 1988 WL 41438, at *2 (S.D.N.Y. Apr. 28, 1988).

Second, to the extent Bankers is relying on a statement in the Supplemental Prospectus that insurance claims would be filed and pursued, that likewise is not actionable. There can be no dispute that any such statement concerns the expected future performance of entities other than Credit Suisse and Credit Suisse Mortgage. Therefore, that statement cannot be the basis of a fraud claim in the absence of factual allegations showing that Credit Suisse and Credit Suisse Mortgage knew at the time the statement was made that the third parties responsible for insurance claims would not file and pursue them. *Thompkins*, 476 F.3d at 1316;

---

Policy provided a 30 day grace period for that payment. TGIC Policy at II.B. Thus, a claim could not even be made until after the Prospectus was issued on October 23, 2001.

*Henneberry*, 532 F. Supp. 2d at 545. Bankers has alleged no facts that would establish such knowledge.

Further, these allegations also concern express obligations under the PSA and Bankers has asserted a breach of contract claim based on them against SPS. PSA § 3.09 (c), (d); SAC ¶¶ 113-17. For the same reasons Bankers cannot state a fraud claim based on an alleged breach of contract with respect to the repurchase or cure obligations, it cannot do so here. *Thompkins*, 476 F.3d at 1316; *Hallinan*, WL 39302, at *11-13.

The lack of factual allegations as to <u>why</u> Credit Suisse and Credit Suisse Mortgage knew or should have known also is fatal because in this failing Bankers has not met the scienter pleading requirement. The requirements of Rule 9(b) likewise are not met in that Bankers has failed to allege what insurance claims were submitted (and in some cases denied), <u>when</u> Credit Suisse and Credit Suisse Mortgage knew about these claims, or why there is anything remotely fraudulent about the submission of a small number of insurance claims and the denial of even a smaller number.

Finally, Bankers has not pled that the alleged failure to disclose denied insurance claims was material as required by law since such claims comprise only approximately 1.4 percent of the mortgage pool. *Wall St. Sys., Inc. v. Lemence*, No. 04-CV-5299, 2005 WL 292744, at *1 (S.D.N.Y. Feb. 8, 2005); *Butterworth v. Quick & Reilly, Inc.*, 998 F. Supp. 1404, 1411 (M.D. Fla. 1998); *Goldstein v. CIBC World Mkts. Corp.*, 776 N.Y.S.2d 12, 14 (App. Div. 2004). The mortgage loan pool was over-collateralized by approximately $2.9 million – a fact Bankers admits (SAC ¶ 19 n.4) – and it is therefore all the more difficult to see how the denial of the insurance claims was material since that amount was available to absorb any losses before the Subordinated Certificates would fail to receive a principal or interest payment. Bankers never alleges that it failed to receive either.[8]

---

[8] Bankers' claim based on the Insurance Omission also fails for the additional reason that Bankers has not alleged that Credit Suisse and Credit Suisse Mortgage had any duty to disclose

*The Cut-Off Date Statement*.  The Second Amended Complaint contains no new allegations regarding the Cut-Off Date Statement, notwithstanding that the Court previously found it lacking under Rule 9(b) and for failure to plead scienter.  The unchanged allegations have not improved by virtue of the passage of time.  Bankers has not alleged <u>when</u> Credit Suisse and Credit Suisse Mortgage knew or should have known of the statement's alleged falsity.  Likewise, Bankers has not alleged <u>why</u> Credit Suisse or Credit Suisse Mortgage should have known that prior to the issuance of the Supplemental Prospectus – a highly relevant allegation given that Bankers relies on documents issued <u>after</u> the date of the Supplemental Prospectus to demonstrate the alleged falsity of the claim.  For that same reason, Bankers' unamended allegations also fail to properly plead scienter.  Finally, Bankers has advanced no reason why it is material that the borrowers on 132 loans (out of 3,448 loans total) – which means approximately 3.8 – were late on their payments.  S. Pr. at S-7, S-24-30.

## B.    The Second Amended Complaint Still Fails to Establish Reasonable Reliance

Bankers' fraud claims also must be dismissed for failure to plead facts establishing reasonable reliance.  Under both New York and Florida law, Bankers must plead factual allegations which, if true, would demonstrate actual, reasonable reliance.  *In re Marsh & McLennan Cos. Sec. Litig*., 501 F. Supp. 2d 452, 495 (S.D.N.Y. 2006); *Tambourine Comerico Int'l, S.A. v. Solowsky*, No. 06-CV-20682, 2007 WL 689466, at *6 (S.D. Fla. Mar. 4, 2007); *Butterworth*, 998 F. Supp. at 1410.

---

the purportedly omitted information.  Under both New York and Florida law, a fraud claim based on an omission is only available where the party that failed to speak had a duty to disclose the subject information.  *Remington Rand Corp. v. Amsterdam-Rotterdam Bank, N.V.*, 68 F.3d 1478, 1483-84 (2d Cir. 1995); *B. Lewis Prods., Inc. v. Angelou*, 06-CV-6390, 2008 WL 1826486, at *4 (S.D.N.Y. Apr. 22, 2008); *Behrman v. Allstate Ins. Co.*, 388 F. Supp. 2d 1346, 1351 (S.D. Fla. 2005).  As a matter of law, there is no duty to disclose information that a party could have discovered through its own diligence.  *Grumman Allied Indus., Inc.*, 748 F.2d at 737; *Advisor's Capital Invs., Inc. v. Cumberland Cas. & Sur. Co.*, No. 05-CV-404, 2007 WL 220189, at *3 (M.D. Fla. Jan. 26, 2007); *Behrman*, 388 F. Supp. 2d at 1351.

It is well-established in New York and Florida that where sophisticated parties like Bankers "enjoy access to critical information but fail to take advantage of that access . . . courts are disinclined to entertain claims of justifiable reliance," particularly where, as here, that party was directed to the relevant information. *Grumman Allied Indus., Inc. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2d Cir. 1984); *see 484 Assocs., L.P. v. Moy*, No. 06-CV-2290, 2007 WL 683999, at *3 (S.D.N.Y. Mar. 5, 2007) (collecting cases); *AHA Gen. Constr., Inc. v. Edelman P'ship*, 737 N.Y.S.2d 85, 87 (App. Div. 2002) (reliance not reasonable where party directed to information); *see also M/I Schottenstein Homes, Inc. v. Azam*, 813 So. 2d 91, 95-96 (Fla. 2002).[9]

**_The Cut-Off Date Statement._**  The Supplemental Prospectus provides that "[n]o mortgage loan will be delinquent more than 30 days as of the cut-off date" (the "Cut-Off Date Statement").  S. Pr. at S-19.  The "cut-off date" is defined in the Supplemental Prospectus as November 1, 2001.  S. Pr. at S-5.  The Second Amended Complaint alleges that this statement was false based on information contained in the December 26, 2001 Trustee Statement.  SAC ¶ 20.  This statement cannot possibly support Bankers' claims for fraud.  It is undisputed that Bankers purchased the Subordinated Certificates over two years after the Supplemental Prospectus was issued (and after 24 Trustee Statements providing updated information had been issued).  The Trustee Statements provided detailed information regarding delinquencies.  As a matter of law, Bankers cannot establish that reliance on information two years old was reasonable when more current information was available.  *Grumman*, 748 F.2d at 737; *see Moy*, 2007 WL 683999, at *3; *Azam*, 813 So. 2d at 95-96; *AHA Gen. Constr., Inc.*, 737 N.Y.S.2d at 87.

**_Insurance Claims and Repurchase/Cure Obligations_**.  As noted above, Bankers cannot dispute that any statements regarding the insurance claims and repurchase/cure obligations refer to expected future conduct by third-parties.  It is unreasonable as a matter of

---

[9]    This brief does not address reasonable reliance with respect to the supposedly changed underwriting criteria because Bankers alleges no misstatements in that regard.

law for Bankers to have relied on two year old statements of expected future conduct when, at the time Bankers made its investment, it had access to up-to-date information regarding the performance of the Trust and therefore had a reasonable basis to know (or at least an obligation to inquire) whether such conduct did or did not occur.

Once again, Bankers cannot possibly dispute that the Supplemental Prospectus expressly directed secondary market purchasers to the Trustee Statements as the "primary source" of information and that stated additional information may not be available from any other source. S. Pr. at 72. Based on the Trustee Statements, Bankers had access to current and historical information, including: (i) the principal and interest distributions for each tranche; (ii) Realized Loss or Writedown amounts, which under the PSA include mortgage loan liquidation proceeds; (iii) payment advances made on the underlying mortgage loans; (iv) loan delinquency information; (v) foreclosure information; and (vi) prepayment information. Tr. Stmt at 1-2. Given the availability of such detailed information to evaluate the economics of an investment in the Certificates, Bankers cannot as a matter of law establish that it reasonably relied on two year old statements regarding expected future conduct of third parties – rather than current financial information – in making its investment decision. *Grumman Allied Indus., Inc.*, 748 F.2d at 737; *see Moy*, 2007 WL 683999, at *3; *Azam*, 813 So. 2d at 95-96; *AHA Gen. Constr., Inc.*, 737 N.Y.S.2d at 87.

**C.     The Second Amended Complaint Still Fails to Establish Proximate Cause**

Bankers must plead facts demonstrating that the factual predicates underlying the fraud claims were in some reasonably direct way responsible for its loss and that the loss was "independent of other causes." *Bennett v. U.S. Trust Co. of N.Y.*, 770 F.2d 308, 315-16 (2d Cir. 1985); *Butterworth*, 998 F. Supp. at 1411. Courts have held this requires a plaintiff to allege "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the [investment]." *Hampshire Equity Partners, II, L.P. v. Teradyne, Inc.*,

No. 04-CV-3318, 2005 WL 736217, at *5 (S.D.N.Y. Mar. 30, 2005) (*quoting Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005), *aff'd*, 159 Fed. Appx. 317 (2d Cir. 2005)). Thus, courts have recognized that "when a plaintiff's loss coincides with a market-wide phenomenon causing comparable losses to other investors, the probability that the loss was caused by an alleged fraud decreases." *Teradyne, Inc.*, 2005 WL 736217, at *5. The Second Amended Complaint contains no allegations whatsoever to meet this requirement with respect to any of its alleged grounds for fraud. Bankers has not and cannot establish that it was the disclosure of facts concerning the allegedly fraudulent activities that caused the Subordinated Certificates to lose their value, and not intervening events in the residential real estate market.

## II.    BANKERS STILL FAILS TO STATE A CLAIM FOR CIVIL CONSPIRACY

Bankers has included six additional paragraphs of conspiracy allegations in the Second Amended Complaint. SAC ¶¶ 156-161. But these new allegations set forth nothing more than, in Bankers' own words, that "each of the defendants [] profited from and played a role in the sale of the [Subordinated Certificates]." SAC ¶ 155. The new allegations still fail to allege facts demonstrating any agreement – a required element under New York and Florida law. *See Fisk v. Letterman*, 424 F. Supp. 2d 670, 677 (S.D.N.Y. 2006); *Tucci v. Smoothie King Franchises, Inc.*, 215 F. Supp. 2d 1295, 1302 (M.D. Fla. 2002). In the Order, this Court determined that Bankers' conclusory civil conspiracy allegations were inappropriate under Rule 8(a)(2). Order at 19. Because the Second Amended Complaint contains no new allegations regarding any agreement among the Defendants, this claim should be dismissed again on this independently sufficient ground. SAC ¶ 153-62.

The conspiracy claim also should be dismissed for the independently sufficient reason that such a claim cannot exist without an actionable underlying tort. *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 401 (2d Cir. 2006); *Williams v. Michelin N. Am., Inc*., No. 04-CV-

815, 2005 WL 2708308, at *2 (M.D. Fla. Oct. 21, 2005).   As set forth above and in the Reconsideration Brief, there is no viable tort claim here.

III.  **BANKERS' NEGLIGENT MISREPRESENTATION, BREACH OF FIDUCIARY DUTY AND BREACH OF CONTRACT CLAIMS SHOULD BE DISMISSED FOR <u>THE REASONS SET FORTH IN THE RECONSIDERATION BRIEF</u>**

        Bankers' Second Amended Complaint contains no new allegations concerning its negligent misrepresentation, breach of fiduciary duty and breach of contract claims that cure the deficiencies demonstrated by the Credit Suisse Defendants in the Reconsideration Brief. Accordingly, to avoid repeating the same arguments here, the Credit Suisse Defendants incorporate and refer to all of the arguments made in the Reconsideration Brief as if fully set forth herein.  Specifically, those claims should be dismissed for the following reasons:

        ***Negligent Misrepresentation***.  Bankers' claims for negligent misrepresentation against Credit Suisse and Credit Suisse Mortgage should be dismissed under both New York and Florida law because such claims cannot be based on statements made to the general investing public and because Bankers cannot establish reasonable reliance.  Recons. Br. at 7-11.  In addition, these claims are barred under New York law by the Martin Act.[10]  Recons. Br. at 13.

        ***Breach of Fiduciary Duty***.  These claims against Credit Suisse and SPS must also be dismissed because Bankers has failed to establish the required relationship and cannot unilaterally create such a relationship without the Credit Suisse Defendants' knowledge and consent.  Recons. Br. at 11-12.  In addition, Bankers cannot repackage its breach of contract claim against SPS as a breach of fiduciary duty claim.  Recons. Br. at 12-13.  Under New York law, these claims are also barred by the Martin Act.   Recons. Br. at 13.

---

10    The negligent misrepresentation claims in the Second Amended Complaint should also be dismissed under Florida law because Bankers has not pled that it is a member of a limited class that Credit Suisse and Credit Suisse Mortgage knew and intended to reach.  Order at 6-7.

**_Breach of Contract_**.  All of the breach of contract claims against DLJ and SPS must be dismissed because Bankers has no standing to pursue them under Federal Rule 23.1 and Section 11.07 of the Pooling and Servicing Agreement, dated November 1, 2001 ("PSA"). Recons. Br. at 3-5.

## IV.    THE SECOND AMENDED COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE

Bankers has now made (and the Credit Suisse Defendants have defended against) three attempts to plead its claims.  As demonstrated above and in the Reconsideration Brief, because it is apparent that Bankers has no legally cognizable claims and that any further amendment would be futile, the Second Amended Complaint should be dismissed with prejudice.  *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1213 (11th Cir. 2001); *Locke v. SunTrust Bank*, 05-CV-1956, 2006 WL 923763, at *4 (M.D. Fla. Apr. 10, 2006).

## CONCLUSION

For the foregoing reasons, the Credit Suisse Defendants respectfully request that the Court dismiss Bankers' Second Amended Complaint with prejudice, and for such other and further relief as this Court deems just and proper.

Dated: New York, New York       Respectfully submitted,
      June 27, 2008

<u>s/Scott E. Eckas</u>
Jeffrey Q. Smith (admitted *pro hac vice*)
Scott E. Eckas (admitted *pro hac vice*)
Colleen J. O'Loughlin (admitted *pro hac vice*)
MCKEE NELSON LLP
One Battery Park Plaza
New York, New York   10004
Telephone: (917) 777-4200
Facsimile: (917) 777-4299
seckas@mckeenelson.com

Counsel for Defendants Credit Suisse
Securities (USA) LLC, Credit Suisse First
Boston Mortgage Securities Corp., DLJ
Mortgage Capital, Inc. and Select Portfolio
Servicing, Inc.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 27, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and that it is being served this day on all counsel of record via transmission of Notices of Electronic filing generated by CM/ECF.

s/ Colleen J. O'Loughlin